| | |
|---|---|
| 1 | PAUL L. GALE, Bar No. 065873<br>paul.gale@troutmansanders.com |
| 2 | SIAVASH DANIEL RASHTIAN, Bar No. 228644<br>daniel.rashtian@troutmansanders.com |
| 3 | THOMAS H. PROUTY, Bar No. 238950<br>thomas.prouty@troutmansanders.com |
| 4 | TROUTMAN SANDERS LLP<br>5 Park Plaza, Suite 1400 |
| 5 | Irvine, CA 92614-2545<br>Telephone: 949.622.2700 |
| 6 | Facsimile: 949.622.2739 |
| 7 | Attorneys for Plaintiffs |
| 8 | BILL A. BUSBICE, JR., OLLA PRODUCTIONS,<br>LLC, and ECIBSUB, LLC |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| BILL A. BUSBICE, JR., an individual; OLLA PRODUCTIONS, LLC, a limited liability company; and ECIBSUB, LLC, a limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>JAMES DAVID WILLIAMS, an individual; *et al.*,<br><br>Defendants. | Case No. CV 14-4077 PA (AJWx) consolidated with CV 14-7063 PA (AJWx)<br><br>Magistrate Judge Andrew J. Wistrich<br><br>**REPLY DECLARATION OF THOMAS H. PROUTY IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL**<br><br>Date: April 6, 2015<br>Time: 10:00 a.m.<br>Place: Courtroom 690<br><br>Discovery Cut-off: July 27, 2015<br>Trial Date: October 6, 2015 |

25213227

REPLY DECLARATION OF THOMAS H. PROUTY IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL

I, Thomas H. Prouty, declare as follows:

1. I am an attorney admitted to practice before this Court at the law firm of Troutman Sanders LLP, counsel for Plaintiffs Bill A. Busbice, Jr. ("Busbice"), Olla Productions, LLC ("Olla"), and Ecibsub, LLC ("Ecibsub") (collectively, "Plaintiffs") in this action. I have personal knowledge as to all matters set forth herein, and if called to testify as a witness, I could and would do so.

**No Amended Interrogatory Responses Have Been Served**

2. Defendants' opposition states: "Defendants have provided further responses to most of the interrogatories as they have always agreed to do." (Dkt. 43 at 12:16-17.) That statement is false, as no amended responses to Plaintiffs' interrogatories have been served.

3. The statement also is misleading in its use of the phrase "as they have always agreed to do." Defendants did not agree to provide proper substantive responses when they asserted an identical set of boilerplate objections to each interrogatory on December 22, 2014. And although I sent Defendants' counsel a detailed meet and confer letter on December 30, 2014 requesting a conference within ten days pursuant to L.R. 37-1, Defendants' counsel failed to comply with the rule, and only made himself available for a conference on January 16, 2015 (17 days after my request), after significant cajoling. It is true that during the January 16th conference, Defendants' counsel conceded that the objections were baseless and that proper responses should and would be provided. But still, to date – more than two months after that conference – not a single amended response has been provided. Additionally, on January 26, 2015, ten days after our conference and after Defendants' counsel knew that service of joint stipulations seeking sanctions was imminent; Defendants' counsel noted for the first time that he had unspecified issues with some unspecified interrogatories.

4. On March 18, 2015, I sent an e-mail to Defendants' counsel regarding his above-referenced representation to the Court. My e-mail stated in part: "I have

no record of receiving amended responses to the interrogatories. If you contend that Defendants have in fact served amended responses to the interrogatories, then please e-mail them to me, along with the signed proof of service and verifications, immediately." (A true and correct copy of the e-mail is attached hereto as Exhibit 1.)

5. As of the signing of this declaration on March 23, 2015, I have received no response to that March 18th e-mail.

**Plaintiffs Did Not Ignore Amended RFP Responses in Order to File an Unnecessary Motion to Compel**

6. A theme of Defendants' opposition is that Plaintiffs ignored Defendants' amended responses to the document requests and Defendants' willingness to provide responses to the interrogatories, and rushed to Court to file an unnecessary motion to compel. A close look at the record, however, shows that claim to be false.

7. The document attached as Exhibit A to Plaintiffs' concurrently-filed reply brief was prepared at my direction to graphically illustrate the timeline of relevant events.

8. Significantly, at the time my office sent Defendants' counsel Plaintiffs' joint stipulations pursuant to L.R. 37-1 (which followed several months of letters, e-mails, broken promises, and multiple discovery conferences), thereby triggering his duty to provide Defendants' contentions, no amended responses to the document requests had been served by Defendants (except for the ones served by Visions and Seppala in November 2014, which Plaintiffs' took into account in the joint stipulations).

9. Proper responses should have been provided in mid-October 2014, and Defendants' counsel promised during the parties' first discovery conference that amended responses from all defendants would be served by November 7, 2014.

10. It was only after Plaintiffs e-mailed their joint stipulations on January 30, 2015 that Defendants' counsel acted. Although the local rules required that action to be providing my office with Defendants' portions of the joint stipulations, Defendants' counsel choose instead to prepare amended responses. Defendants' counsel was able to complete amended responses on behalf of a few of the Defendants over the next few days after receiving the joint stipulations, but he was still serving amended responses on behalf of other defendants even after Plaintiffs' filed their motion to compel on February 9, 2015.

11. As explained in my initial declaration in support of the motion to compel, the amended responses that Defendants' counsel was able to complete and serve prior to the filing of the motion to compel were still deficient in that they: (1) continued to rely on baseless privacy objections to justify non-production in response to many requests; (2) asserted that the responding party was unable to comply with certain requests because it had no responsive documents (without stating that any search had been made); and (3) claimed that the responding party would produce documents at some unspecified time in the future "to the extent that they [could] be located through a diligent search" with no indication as to when such documents would be produced and what efforts would be made to locate them.

12. It is apparent that Defendants' counsel made the calculated decision to ignore his duty under L.R. 37-1 to complete the joint stipulations and to use that time (and more) to prepare amended responses, which only cost Defendants more promises.

13. Based on the record and my meet and confer attempts in this case, I believe that that decision was just another improper delay tactic, designed to forestall this Court's review of Defendants' discovery abuse and Defendants' counsel's own failures.

**Plaintiffs' Were Open to Appointment of a Special Master That Could Make Binding Rulings, but Rejected Defendants' Proposal of Informal Mediation**

14. Defendants' opposition states that Defendants offered to stipulate to a private discovery referee to mediate discovery issues and "make *binding recommendations* based on such mediation." (Dkt 43 at 20:27-21:1.) I wish to make clear that while Defendants' counsel did offer to stipulate to informal and non-binding mediation of discovery disputes, he never offered to stipulate that defendants would be "bound" by the mediator's decision.

15. I advised Defendants' counsel that while Plaintiffs were open to appointment of a special master with authority to formally resolve discovery disputes, Plaintiffs could not agree to an informal and non-binding procedure, which would only further delay entry of a binding order compelling compliance if Defendants continued to act as they have since this case started.

**Defendant Garuda Partners, Ltd. and the Purchase of the Calabasas Property**

16. Plaintiffs' Complaint alleges that Defendants fraudulently transferred over $700,000 of Plaintiffs' money contained in Moment Factory, LLC's ("Moment Factory") JPMorgan Chase Bank ("Chase") account to purchase certain real property in Calabasas, California (the "Calabasas Property") in the name of Defendant "Garuda Partners, Ltd., as Trustee of the Mulholland Ridge Trust." (*See* Dkt. 1 (the Complaint, also found as Exhibit 1 to my initial declaration) at ¶ 83.)

17. On February 25, 2015, well after the Complaint was filed, but before Defendants filed their opposition to the instant motion to compel, Defendant Williams provided sworn testimony in an arbitration proceeding (to which Plaintiffs are not parties) regarding the above-referenced allegation in Plaintiffs' Complaint. Defendant Williams essentially testified that the Luxe One money was used to purchase land so that the land could be used as collateral for additional money to use for prints-and-advertising for films. A true and correct copy of a relevant excerpt of the transcript of Williams' testimony in the arbitration is attached hereto as Exhibit 2.

18. Defendants' opposition to the instant motion to compel fosters that incredible explanation, by stating that "Garuda Partners, Ltd. is the trustee of a Trust that was acquiring land to be collateral for credit lines." (Dkt. 43 at 6:9-10.)

19. Because my review of genuine bank statements for Moment Factory's Chase account reflected a transfer of more than $700,000 to First American Title Company (the "Title Company"), on September 26, 2014, I issued a Subpoena directed to the Title Company, requesting that they produce, *inter alia*, documents related to that transfer and any associated transactions. A true and correct copy of that subpoena is attached hereto as Exhibit 3.

20. The Title Company produced documents in response to the subpoena the following month. A true and correct copy of the signed "Declaration of Records Custodian" served by the Title Company along with its production in response to the subpoena is attached hereto as Exhibit 4.

21. Attached hereto as Exhibits 5 through 10 are true and correct copies of selected documents produced by the Title Company in response to the Subpoena.

22. Exhibit 5 is a Grant Deed reflecting that the Calabasas Property was transferred to Defendant "Garuda Partners, Ltd., as Trustee of the Mulholland Ridge Trust."

23. Exhibit 6 is a Final Settlement Statement and Receipts for Deposits, indicating that the Calabasas Property was purchased through transfers of money exceeding $700,000 from Moment Factory's Chase account.

24. Exhibit 7 is a letter apparently signed by Defendant Williams representing to the Title Company that "J. David Williams is the Acting General Manager and Controller of Garuda, Ltd. Garuda, Ltd. is a Limited Partnership formed in Luxembourg. . . . As the Acting Trustee of the Mulholland Ridge Trust, he is authorized to sing [sic] and act on behalf of Garuda, Ltd."

25. Exhibit 8 is an e-mail string from February 2014 reflecting that a representative of the seller asked why the purchase money for the Calabasas

1  Property was coming from Moment Factory when the "agreement is that BUYER
2  deposits." The e-mail string further reflects that that concern was alleviated when it
3  was said in response that: "Moment Factory is a service that David uses for
4  domestic funds wiring. He transferred his funds into Moment Factory and they
5  wire the funds out at no cost. So it would seem it is a non-issue."

6        26.    Exhibit 9 is an e-mail string, dated March 28, 2014, with attachment,
7  reflecting Defendant Williams' transmission to the Title Company of "documents
8  from the formation of the Land Trust called Mulholland Ridge Trust." Mr.
9  Williams' e-mail to the Title Company states in part: "I of course have formed this
10 Trust to protect the asset purchase and would like as little of this made public as
11 possible." The attachment to the e-mail includes a trust document indicating that
12 the beneficiaries of The Mulholland Ridge Trust are: "Parker James Williams, an
13 Individual, Carter Davidson Williams, an Individual, and Windsor Nicole Williams,
14 and [sic] Individual[.]"

15       27.    Exhibit 10 is an e-mail sting, dated March 28, 2014, with attachment,
16 which reflects that Defendant Williams responded to an e-mail from the Title
17 Company by stating, in part: "why would the beneficiaries of the Trust need to sign
18 . . . they are not Trustees, by law a Beneficiary has no authority beyond . . . the
19 financial benefit of the Trust? My daughter is 11 years old." (Ellipses in original.)

20       28.    Defendants have not produced documents relating to Garuda Partners,
21 Ltd. or the purchase of the Calabasas Property.

### The Chase Subpoena and Some Revelations

23       29.    On October 27, 2014, I issued a subpoena on JPMorgan Chase Bank
24 ("Chase"), requesting, *inter alia*, production of various entities' bank records (the
25 "Chase Subpoena").

26       <u>The Steven Brown-Controlled Secret Luxe One Chase Account</u>
27       30.    Among the documents produced by Chase in response to the Chase
28 Subpoena include statements and activity records for two different accounts held in

25213227      - 6 -
REPLY DECLARATION OF THOMAS H. PROUTY IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL

the name of Defendant Luxe One, Inc. ("Luxe One"). One of these Luxe One accounts ends in 2939 and is referred to herein and in the Complaint as the "Luxe One 2939 Account." (*See* Dkt. 1 (also Ex. 1 to my initial declaration) at ¶¶ 76-78.) The Luxe One 2939 Account is the Luxe One account that Plaintiffs knew about and into which their investments in Luxe One/*The Letters* were wire transferred. The other Luxe One account ends in 1572 and is referred to herein and in the Complaint as the Luxe One 1572 Account. The Complaint alleges that the Luxe One 1572 Account was at all times kept a secret from Plaintiffs. (*Id*.)

31. The Chase documents relating to the Luxe One 2939 Account reflect that Defendant Williams had authority and control over the account.

32. The Chase documents relating to the Luxe One 1572 Account reflect that both Defendant Williams and Defendant Brown had authority and control over the account.

33. Attached hereto as Exhibit 11 is a true and correct copy of statements of the Luxe One 1572 Account from June 2013 through August 2014, which were produced by Chase in response to the Chase Subpoena.

34. Overtime, approximately $1 million flowed into the Luxe One 1572 Account directly from either the Luxe One 2939 Account or the Moment Factory Chase account, both of which were funded by Plaintiffs.

35. As can be seen in Exhibit 11, Defendant "Steven J. Brown" used ATM & Debit Card No. 1507 in connection with the Luxe One 1572 Account.

36. A cursory review of the bank statements is all that is needed to see that Defendant Brown treated the Luxe One 1572 Account as if the money therein was for his own personal use and enjoyment, and that he signed for and made repeated withdrawals and transfers of substantial sums of money during the year that the account was active.

37. Among the transfers directed by Defendant Brown from the Luxe One 1572 Account were transfers of at least $238,000 to the Chicago-based law firm of

1  Collins, Bargione & Vuckovich (the "CBV Law Firm"). Attached hereto as Exhibit
2  12 are excerpts of the Luxe One 1572 Account records produced by Chase
3  reflecting these transfers to the CBV Law Firm.

4      38.    The CBV Law Firm's website indicates that it has five lawyers, and
5  that its practice areas include securities, criminal defense, and civil and criminal
6  RICO actions. A true and correct copy of print-outs from the firm's website is
7  attached hereto as Exhibit 13.

8      39.    The first time that Defendants' counsel produced any documents on
9  behalf of Defendant Brown in this action was March 17, 2015 – shortly after
10 Defendants filed their opposition to the instant motion to compel, and five months
11 after production was initially due. This March 17th production, however, consisted
12 of only one 146-page PDF file, which Defendants' counsel simply represented as
13 being "Steve Brown's e-mail." The first 42 pages are simply drafts of documents
14 drafted by *Plaintiffs'* counsel in May 2014 and exchanged with certain Defendants
15 around the time that the Complaint was filed.

16     40.    I have reviewed the remaining 102 pages, which are print-outs of a
17 handful of e-mails. However, like the Defendants' earlier production (*see* ¶ 26 of
18 my initial declaration), almost all of those e-mails involve Plaintiffs or Plaintiffs'
19 representatives as a sender or recipient. Moreover, almost all of those e-mails are
20 from the March-April 2014 timeframe, when Plaintiffs were searching for answers
21 and after most of Plaintiffs' money was already spent or transferred by Defendants.
22 In addition, some of the "top-level e-mails" between Defendants have been
23 redacted without an accompanying privilege log. There is only approximately 15
24 pages worth of e-mails from before March 2014, and again, most of those e-mails
25 involve Plaintiff or their representatives. Conspicuously missing from these e-
26 mails are any e-mails between and among the Defendants (and alleged co-
27 conspirators) themselves.

28

41. Plaintiffs did not just request e-mails, but any type of document (electronically-stored or otherwise) that relates to the subjects of this suit, including, for example, text messages, which no defendant has produced at any time in this action.

42. None of the documents produced by Brown evidence, explain, reflect or relate to any transfers of Plaintiffs' money after it was put into the investment entities' accounts, let alone any of the transfers or withdrawals (totaling well over $1 million) that he himself directed.

43. In sum, like Defendants' earlier production, it appears that Defendant Brown was permitted to completely ignore Plaintiffs' actual document requests and simply selectively disclose the few e-mails that he wanted to produce.

<u>Defendant Bipartisan Coalition for American Security Corporation</u>

44. Among the documents produced by Chase in response to the Chase Subpoena include statements and activity records for an account held in the name of Defendant Bipartisan Coalition for American Security Corporation ("Bipartisan Coalition").

45. Attached hereto as Exhibit 14 is a true and correct copy of statements of Bipartisan Coalition's Chase account from June 2013 through July 2014 (with social security numbers, tax payer ID numbers and similar identification numbers redacted).

46. The records for the Bipartisan Coalition account show the following:
    a. The account was opened in June 2013 with Defendant Williams as the account's signatory.
    b. The account carried a $0 balance until $50,000 from the Luxe One 2939 Account was deposited into the Bipartisan Coalition account on July 8, 2013.
    c. The next activity associated with the Bipartisan Coalition account was a July 25, 2013 transfer of $20,000 from the

        Bipartisan Coalition account to the secret Defendant Brown-controlled Luxe One 1572 Account.

    d. The next activity associated with the Bipartisan Coalition account came on August 6, 2013, when $60,000 from the Luxe One 2939 Account was deposited into the Bipartisan Coalition account.

    e. Then, later that same day (Aug. 6, 2013), two wire transfers of $43,000 each were made – one apparently having something to do with former Senator Joseph Lieberman, and one apparently having something to do with former Senator Scott Brown. These transfers left a balance of $3,950.

    f. The next activity associated with the Bipartisan Coalition account came on October 21, 2013, when $1,000 was transferred from the Bipartisan Coalition account to the Defendant Brown-controlled Luxe One 1572 Account.

    g. There was no activity (other than service fees) until July 23, 2014, a couple of months after this lawsuit was filed, when Defendant Williams closed the account and withdrew the remaining $2,845 in cash.

47. Based on my review of the limited documents produced by Defendants to date, Defendants have produced no documents or communications evidencing, explaining, reflecting or relating to any of these transfers or, more generally, Bipartisan Coalition's role, activities, or services regarding the subject film investments.

### Defendant Highgate Pass, LLC

48. Genuine bank records produced by Chase pursuant to the Chase Subpoena show that more than $175,000 was transferred to Defendant Highgate

Pass, LLC ("Highgate Pass") directly from the Luxe One 2939 Account and the Moment Factory Chase account.

49. Attached hereto as Exhibit 15 is a true and correct copy of excerpts from the Chase production showing these transfers from the Luxe One 2939 Account and the Moment Factory Chase account to Defendant Highgate Pass.

50. These transfers included:

   a. A transfer of $50,000 from the Luxe One 2939 Account on July 18, 2013;
   b. A transfer of $7,500 from the Luxe One 2939 Account on October 2, 2013;
   c. A transfer of $7,000 from the Luxe One 2939 Account on October 23, 2013;
   d. A transfer of $50,000 from the Moment Factory Account on November 1, 2013;
   e. A transfer of $20,000 from the Luxe One 2939 Account on December 27, 2013;
   f. A transfer of $30,000 from the Luxe One 2939 Account on February 18, 2014; and
   g. A transfer of the remaining balance of $11,382.53 from the Moment Factory Chase account on July 23, 2014 – a couple of months after this lawsuit was filed and the same day that Defendant Williams closed the Bipartisan Coalition account and withdrew the remaining cash in that account.

51. Based on my review of the limited documents produced by Defendants to date, Defendants have produced no documents or communications evidencing, explaining, reflecting or relating to any of these transfers or, more generally, Highgate Pass's role, activities, or services regarding the subject film investments.

## Defendant Legacy Film Crest, LLC

52. Genuine bank records produced by Chase pursuant to the Chase Subpoena show that nearly $1 million was transferred into a Chase account held by Defendant Legacy Film Crest, LLC ("Legacy") directly from all three of the subject investment entity accounts (*i.e.*, the accounts held by Luxe One, Moment Factory and Visions).

53. Attached hereto as Exhibit 16 is a true and correct copy of excerpts from the Chase production showing these transfers, which show the following:

- The same day that Plaintiffs wire transferred their $500,000 investment into the Visions, LLC Chase account for the *Made in America* investment (April 26, 2013), $450,000 of that money was wire transferred to the Legacy Chase account. Another $35,000 was wire transferred from the Visions Chase account to the Legacy account three days later. At the time of those transfers, the Legacy Chase account had a negative balance.
- On July 8, 2013, $100,000 was transferred into the Legacy Chase account from the Luxe One 2939 Account, and another $50,000 was transferred from the Luxe One 2939 Account one week later.
- On August 1, 2013, $25,000 was transferred into the Legacy Chase account from the Luxe One 2939 Account.
- On September 13, 2013, $35,000 was transferred into the Legacy Chase account from the Luxe One 2939 Account.
- On October 23, 2013, $7,500 was transferred into the Legacy Chase account from the Luxe One 2939 Account.
- On November 4, 2013, $50,000 was transferred into the Legacy Chase account from Moment Factory's Chase account.
- On January 3, 2014, $25,000 was transferred into the Legacy Chase account from Moment Factory's Chase account, and another $25,000

1  was transferred into the Legacy Chase account from the Luxe One
2  2939 Account.

3  - On January 17, 2014, $100,000 was transferred into the Legacy Chase
4    account from the Luxe One 2939 Account.

5  - On March 5, 2014, $75,000 was transferred into the Legacy Chase
6    account from the Luxe One 2939 Account.

7  - On April 11, 2014, $25,000 was transferred into the Legacy Chase
8    account from Moment Factory's Chase account.

9  54. I have reviewed the complete set of statements for the Legacy Chase
10 account from April 2013 to April 2014. Much like Defendant Brown's treatment of
11 the secret Luxe One 1572 Account, Defendant Williams treated the Legacy Chase
12 account as a personal piggy bank, spending enormous sums on things such as
13 luxurious vacations, his children's private school tuition, and yacht club
14 membership fees.

**Plaintiffs' Money Traced to Post-Lawsuit Purchase of Defendant Williams' Residence**

17 55. My review of genuine bank statements for the Luxe One 2939 Account
18 produced by Chase in response to the Chase Subpoena revealed transfers exceeding
19 $240,000 to Pickford Escrow Company, Ron Gonen and Rdjr Holdings, LLC. True
20 and correct excerpts of such bank statements that reflect these transfers are attached
21 hereto as Exhibit 17.

22 56. I issued a subpoena directed to Pickford Escrow Company on October
23 15, 2014, a true and correct copy of which is attached hereto as Exhibit 18.

24 57. Pickford Escrow Company produced documents in response to the
25 subpoena. A true and correct copy of the signed "Declaration of Custodian of
26 Records" served by Pickford Escrow Company along with its production is
27 attached hereto as Exhibit 19.

28

58.	Attached hereto as Exhibits 20 through 22, respectively, are true and correct copies of selected documents produced by Pickford Escrow Company in response to the Subpoena. These documents reflect that:

    a. On September 15, 2014, several months after this lawsuit was filed, the sale of a $3.5 million house closed, with Rdjr Holdings, LLC as seller, and Mirada Park, LLC (a newly created limited liability company controlled by Defendant Williams and his wife, Kammie L. Williams) as buyer;

    b. Ron Gonen is the principal of Rdjr Holdings, LLC; and

    c. The aforementioned transfers from the Luxe One 2939 Account exceeding $240,000 went toward the purchase of the house (with more than $140,000 initially being paid as $16,000 monthly rental payments, and then ultimately being applied toward the purchase price, pursuant to a lease with an option to buy).

59.	Exhibit 20 is a copy of the Amended Master Final Settlement Statement produced by Pickford Escrow Company.

60.	Exhibit 21 is a Grant Deed produced by Pickford Escrow Company.

61.	Exhibit 22 is a copy of an e-mail string indicating that monthly rental payments of $16,000 were to be applied toward the purchase price.

62.	I also issued a subpoena directed to Rdjr Holdings, LLC. After the subpoena was served, I received a call from a David Chaimowitz, a representative of the company. He informed me that Rdjr Holdings, LLC had originally entered into the "lease with an option to buy" the house with Defendant Williams "on behalf of the Garuda Trust" as lessee/buyer, but that Williams later assigned his rights to Mirada Park, LLC for the actual closing of the sale. Later, on October 24, 2014, Mr. Chaimowitz e-mailed me what he described as the "Lease with Purchase Option contract from June 2013" ("Lease with Option"). The Lease with Option

does, in fact, refer to "J. David Williams on behalf of, the Garuda Trust" as the "Buyer." A true and correct copy of the Lease with Option is attached hereto as Exhibit 23.

**Just a Couple (of the Many) More Examples of Misuse of Plaintiffs' Money**

63. My review of genuine bank statements for the Luxe One 2939 Account produced by Chase in response to the Chase Subpoena revealed a transfer of $89,394.20 from that account to Residential Fund 118, LLC.

64. I issued a subpoena directed to Residential Fund 118, LLC on October 15, 2014, a true and correct copy of which is attached hereto as Exhibit 24.

65. The last page of Exhibit 24 (a document produced by Chase) contains a reproduction of a $89,394.20 check written to Residential Fund 118, LLC and apparently signed by Defendant Williams, which has the following memo: "Payoff – Loan for Residence and Boat."

66. Attached hereto as Exhibit 25 is a true and correct copy of documents produced by Residential Fund 118, LLC in response to the subpoena. These documents reflect that the aforementioned $89,394.20 transfer from the Luxe One 2939 Account was used to pay off a loan obtained to purchase a 1982 75 foot Motor Yacht. The borrower/buyer was "The Garuda Trust" and the purchase agreement was signed by "J. David Williams." The contact information provided for "The Garuda Trust" on the purchase agreement contained the street address and e-mail address most often associated with Defendant Williams.

67. Documents produced by Chase pursuant to the Chase Subpoena also reflect that tens of thousands of dollars were diverted from Luxe One to "Marriot Ownership Resorts, Inc." True and correct copies of bank records reflecting such transfers are attached hereto as Exhibit 26.

**The Defendants Continue to Selectively Disclose Only What they Want to Disclose, and their Production to Date is Woefully Incomplete**

68. Defendants' production to date is extremely incomplete.

69.  Plaintiffs have been able to learn a little bit about what happened to their money by subpoenaing third parties. And third parties have produced documents that one or more of the Defendants would clearly have in their possession, custody or control. Such documents, however, have not been produced by Defendants.

70.  As discussed earlier, no documents or communications evidencing, explaining, reflecting or relating to any of the transfers involving Highgate Pass and Bipartisan Coalition, or relating to those entities' roles, activities or services regarding the subject film investments have been produced. And no documents or communications relating to Defendant's Brown's transfers and withdrawals and roles, activities and services have been produced. Furthermore, none of the Defendants have produced documents relating to the purchase of the Calabasas Property, or the post-lawsuit purchase of Williams' residence, or the payments to Residential Fund 118, LLC and Marriot Ownership Resorts, Inc.

71.  Although Defendants converted almost $11 million, they have produced next to nothing showing to where and to whom the money went, or why. That is what this case is about, and Defendants have completely stonewalled Plaintiffs.

72.  Faced with the reality that Plaintiffs now had genuine bank records of the investment entities' Chase accounts showing the multitude of transfers for things having nothing to do with the subject films, Defendant Williams, while testifying in the aforementioned arbitration proceedings, has recently asserted that although he took enormous amounts for his own benefit, he was intending to treat those amounts as loans from the investment entities, which he would repay with interest. A true and correct copy of a relevant excerpt from Williams' arbitration testimony is attached hereto as Exhibit 27.

73.  One would expect there to be detailed accounting books and records for the investment entities (e.g. Luxe One, Moment Factory and Visions) in any

event. But that would be especially true if Defendant Williams truly did intend to repay any "loans" that he received from the entities. However, although they were clearly requested (*see, e.g.*, RFP Nos. 29-31), absolutely no financial and accounting records have been produced by any of the Defendants.

74. Furthermore, no text messages have been produced by any of the defendants, although Defendants did text Plaintiffs during the relevant period.

75. In their opposition, Defendants vaguely claim that "thousands" of pages have been produced. However, Defendants omit that: (a) most of these documents were produced well after plaintiffs' motion to compel was filed; and (b) more than two thousand of these pages are simply copies of documents that another party produced to Defendants in the aforementioned arbitration.

76. Based on my involvement in this case and review of documents produced to date, I believe that Defendants have produced only a very small fraction of the relevant and responsive documents that they must have in their possession, custody or control.

77. Furthermore, as stated in my earlier declaration and above regarding the recent and meager Defendant Brown production, it appears that Defendants are simply selecting and producing the documents that they do not mind producing, rather than producing all relevant information. In particular, there is a conspicuous absence of communications among and between the Defendants themselves.

**Plaintiffs Consistently and Repeatedly Advised Defendants that ESI had to be produced in the Requested (and Un-Objected to) Format**

78. Plaintiffs have never said (or even suggested) that Defendants could produce electronically-stored information ("ESI") in any format other than the one that was stated in Plaintiffs' requests for production of documents. On the contrary, I have repeatedly and consistently advised Defendants' counsel that, given the facts of this case (*e.g.*, the creation and transmission of fake bank records, *see* ¶¶ 8-16

1  and Exhibits 4-10 to my initial declaration), compliance with the specified format
2  was required. *See, e.g.*, Exs. 12, 13, 19, 22 to my initial declaration.

3  79. During my discussions with Defendants' counsel, I advised him that
4  Plaintiffs' specified format for the production of ESI was a standard format used in
5  litigation such as this, and that any one of the numerous e-discovery vendors in the
6  market would understand what was requested and be able to prepare the production
7  in a short period of time for a fair price. I advised Defendants' counsel that if
8  Defendants turned over their computers, tablets and phones then Plaintiffs would
9  handle recovering the relevant data, but that offer was declined.

**An Insufficient Privilege Log was Belatedly Provided For Defendant Reiss, But No Other Logs Have Been Provided**

80. Although Defendants' original responses to Plaintiffs' requests for production of documents were due and provided on October 14, 2014 (except for Defendant Reiss, whose responses were due on January 5, 2015), no privilege log was provided by any Defendant until *after* Plaintiffs filed the instant motion to compel on February 9, 2015 – almost four months after responses were originally due. And that privilege log that was belatedly served after the motion was filed was represented by Defendants' counsel as being only of Defendant Reiss's documents, but not of any other Defendant. To date, the only privilege log that has been provided was that one post-motion log of Defendant Reiss's allegedly privileged documents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 23, 2015 at Irvine, California.

/s/ Thomas H. Prouty
Thomas H. Prouty