PAUL L. GALE, Bar No. 065873
paul.gale@troutmansanders.com
SIAVASH DANIEL RASHTIAN, Bar No. 228644
daniel.rashtian@troutmansanders.com
THOMAS H. PROUTY, Bar No. 238950
thomas.prouty@troutmansanders.com
TROUTMAN SANDERS LLP
5 Park Plaza, Suite 1400
Irvine, CA  92614-2545
Telephone:  949.622.2700
Facsimile:   949.622.2739

Attorneys for Plaintiffs
BILL A. BUSBICE, JR., OLLA PRODUCTIONS,
LLC, and ECIBSUB, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| BILL A. BUSBICE, JR., an individual; OLLA PRODUCTIONS, LLC, a limited liability company; and ECIBSUB, LLC, a limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>JAMES DAVID WILLIAMS, an individual; *et al.*,<br><br>Defendants.<br><br>AND RELATED CONSOLIDATED ACTION. | Case No.  CV 14-4077 PA (AJWx) consolidated with CV 14-7063 PA (AJWx)<br><br>Magistrate Judge Andrew J. Wistrich<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR DETERMINATION OF APPLICATION OF CRIME-FRAUD EXCEPTION**<br><br>Date:      May 11, 2015<br>Time:     10:00 a.m.<br>Place:    Courtroom 690<br><br>Discovery Cut-off:  July 27, 2015<br>Trial Date:  October 6, 2015 |

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA  92614 - 2545

24871305

# **TABLE OF CONTENTS**

**Page**

1. INTRODUCTION ................................................................................................ 1

2. THE PARTIES AND THE CLAIMS ................................................................. 3

   2.1 The Plaintiffs .............................................................................................. 3

   2.2 The Defendants .......................................................................................... 3

   2.3 The Claims ................................................................................................. 4

3. THE FRAUDULENT INDUCEMENT ............................................................. 4

   3.1 Made in America / Visions, LLC .............................................................. 4

   3.2 The Letters, Part I / Luxe One, Inc ........................................................... 6

   3.3 Left Behind ................................................................................................ 8

   3.4 Angels Sing / Moment Factory, LLC ....................................................... 9

   3.5 The Letters, Part II / Luxe One, Inc ........................................................ 12

4. THE CONVERSION AND FRAUDULENT TRANSFERS ........................... 14

   4.1 The Secret Luxe One Account Misappropriated by Steven Brown .......................................................................................................... 14

   4.2 Transfers to and From the Williams-Controlled Legacy Account ..... 14

   4.3 Over $700,000 is Used to Purchase Vacant Land in Calabasas ......... 15

   4.4 Fraudulent Transfers to the other Transferee-Entity Defendants ...... 15

      4.4.1 Bipartisan Coalition ..................................................................... 15

      4.4.2 Highgate ....................................................................................... 15

   4.5 Plaintiffs' Money has Been Traced to the Post-Lawsuit Purchase of Williams' Luxury Home ...................................................................... 16

   4.6 Plaintiffs' Money Also Has Been Used to Pay for a Yacht and Vacations, as Well as for Many Other Unauthorized Purposes ......... 16

5. THE FRAUDULENT COVER UP .................................................................. 17

   5.1 The Mysterious (and Fictional) Carol Martin Provides Phony Accounting and Financial Information in March 2014 .................... 17

   5.2 Defendants Provide Busbice with Further Phony Bank Records ...... 18

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA 92614 -2545

- i -

# TABLE OF CONTENTS
### (continued)

Page

6. DEFENDANTS' ATTEMPTS TO EXPLAIN THE FRAUD AFTER IT WAS EXPOSED ARE THEMSELVES FALSE AND FRAUDULENT ...................................................................... 18

    6.1 Williams Spins an Incredible Tale in an Attempt to Explain the Purchase of the Calabasas Property; But Documents Produced by the Title Company Expose the Lies on Top of Lies ..................... 18

    6.2 Williams' Attempt to Blame the Fictional and Unreachable Carol Martin is Comical – Until it is Remembered that it is a Despicable Excuse to Evade Responsibility for the Theft of Nearly $11 Million ................................................................. 20

    6.3 The Only Accountings Provided Have Been Demonstrably False .... 20

7. THE CRIME FRAUD EXCEPTION CLEARLY APPLIES ...................... 21

    7.1 Federal Common Law Applies; But State Law is Similar ................ 21

    7.2 Elements of the Crime-Fraud Exception ........................................... 21

        7.2.1 The Attorney Need Not Himself Be Aware of the Fraud ........ 22

    7.3 The Exception's Scope Includes All Documents Reasonably Related to the Fraud, and Applies to Work Product As Well ........... 22

    7.4 A Preponderance of the Evidence is All That is Needed to Bypass In Camera Review and Order Production of Documents ...... 23

    7.5 The Threshold is Much Lower to Trigger In Camera Review ........... 23

    7.6 The Evidence is Overwhelming That the Exception Applies ........... 23

8. THE REQUESTED RELIEF ........................................................................ 25

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA 92614 - 2545

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR DETERMINATION OF APPLICATION OF CRIME-FRAUD EXCEPTION

# TABLE OF AUTHORITIES

**Page**

CASES

*Cunningham v. Connecticut Mut. Life Ins.*,
   845 F. Supp. 1403 (S.D. Cal. 1994) ................................................................. 22

*Dollar Tree Stores, Inc. v. Toyama Partners LLC*,
   2011 U.S. Dist. LEXIS 125148 (N.D. Cal. Oct. 28, 2011) ................................ 23

*Dunfee v. Truman Capital Advisors, LP*,
   2013 U.S. Dist. LEXIS 165936 (S.D. Cal. Nov. 20, 2013) ............................... 21

*Everflow Tech. Corp. v. Millennium Electronics, Inc.*,
   2013 U.S. Dist. LEXIS 4810 (N.D. Cal. Jan. 11, 2013) ................................... 22

*In re Grand Jury Proceedings (Corporation)*,
   87 F.3d (9th Cir. 1996) ...................................................................................... 22

*In re Grand Jury Proceedings*,
   867 F.2d 539 (9th Cir. 1989) ....................................................................... 21, 22

*Kismet Acquisition, LLC v. Diaz-Barba*,
   755 F.3d 1130 (9th Cir. 2014) ........................................................................... 22

*In re Napster, Inc. Copyright Litig.*,
   479 F.3d 1078 (9th Cir. 2007) ..................................................................... 22, 23

*Roberts v. Heim*,
   123 F.R.D. 614 (N.D. Cal. 1988) ................................................................ 21, 22

*SonicBlue Claims LLC v. Portside Growth & Opportunity Fund*,
   2008 Bankr. LEXIS 181 (Bankr. N.D. Cal. Jan. 18, 2008) .............................. 23

*Speaker v. County of San Bernardino*,
   82 F. Supp. 2d 1105 (C.D. Cal. 2000) ............................................................... 21

*Swortwood v. Tenedora de Empresas, S.A. de D.V.*,
   2014 US Dist. LEXIS 29247 (S.D. Cal. Mar. 6, 2014) ..................................... 23

*United States v. Chen*,
   99 F.3d 1495 (9th Cir. 1995) ............................................................................. 23

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614 - 2545

- iii -

1

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>**Page**</u>

*United States v. Friedman,*
   445 F.2d 1076 (9th Cir. 1971).................................................................. 22

*United States v. Hodge & Zweig,*
   548 F.2d 1347 (9th Cir. 1977)................................................................... 2

*United States v. Oettinger,*
   1992 U.S. Dist. LEXIS 21087 (N.D. Cal. Sept. 2, 1992) ................................ 22

S**TATUTES**

Cal. Evid. Code § 956............................................................................... 22

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
DETERMINATION OF APPLICATION OF CRIME-FRAUD EXCEPTION

## 1.    INTRODUCTION

This is an action to remedy a massive fraud by which (at least) four individuals conspired to, and did, swindle plaintiff Bill A. Busbice Jr. ("Busbice") out of $10,900,000.  As part of a continuing scheme lasting nine months, the individuals fraudulently induced Busbice and two of his limited liability companies ("Plaintiffs") to invest nearly $11 million in special purpose investment-entities that purportedly owned lucrative marketing and/or production rights to a feature length documentary (*Made in America*), and three feature films (*Left Behind*, *The Letters*, and *Angels Sing*).  The investment opportunities, however, were a complete sham.

The fraud in this case is palpable.  To gain Busbice's trust, defendants held themselves out as experienced businessmen with many important connections and financial successes in the film industry.  They then created and used fake and materially false bank records and agreements, and made repeated lies about the investment projects, to induce Plaintiffs' investments.  Instead of using Plaintiffs' money as intended, defendants fraudulently transferred that money to various alter ego entity-defendants under their control, or used it for other film projects and business ventures, or engaged in personal spending sprees.  And when Plaintiffs started asking too many questions, defendants created more fake and demonstrably false banking and accounting records to cover up their actions.  When the fraud was discovered, only about $700,000 remained from Plaintiffs' original $10,900,000.

As a result, Plaintiffs have sued four of the individual conspirators, as well as seven sham and alter ego entities that the individual defendants controlled and used to carry out the fraud and/or to wrongfully divert the proceeds (collectively, "Defendants").  Plaintiffs allege securities and common law fraud, conspiracy to defraud, conversion, constructive trust, and fraudulent transfer claims.

These are not just allegations – they are irrefutable facts.  Genuine bank statements produced by JPMorgan Chase Bank ("Chase") and documents produced by other third parties prove the fraud.  Indeed, Defendants already have been forced

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

to admit much of the falsity.  And their attempt to manufacture some semblance of an explanation or defense has only served to further incriminate them.

In extracting the final $6,000,000, Defendants relied extensively on one of the individual defendants – attorney Barry J. Reiss ("Reiss") – to carry out and further perpetuate the fraud.  Reiss served as an attorney for defendant James David Williams and the special purpose investment-entities vis-à-vis Plaintiffs in securing Plaintiffs' investments.  Reiss himself made and/or affirmed many of the false representations made to Plaintiffs, and transmitted fraudulently-created bank statements to Plaintiffs, all of which were undeniably intended to induce the investments.  In addition, it appears that Reiss also provided "behind-the-scenes" assistance to Defendants with respect to the earlier investments.

Defendants seek to shield their highly relevant communications with Reiss – whom Plaintiffs allege intentionally participated in the conspiracy to defraud – based on the attorney-client privilege.  However, Defendants' reliance on the privilege is unavailing for two reasons.  First, it is unspecified and impermissibly vague.  Despite Plaintiffs' repeated requests for clarification, Defendants have failed to disclose the specific matters for which Reiss was retained, who all of his clients were, and what the temporal and subject-matter scope of the representations were.  Consequently, Plaintiffs have not satisfied their initial burden of establishing the attorney-client privilege with respect to many of their privilege log entries.  Indeed, the great majority of those entries are for communications that post-date the last of Plaintiffs' investments, and approximately half of the communications even post-date the filing of this lawsuit.

Second, "[b]ecause the attorney-client privilege is not to be used as a cloak for illegal or fraudulent behavior, it is well established that the privilege does not apply where legal representation was secured in furtherance of intended, or present, continuing illegality." *United States v. Hodge & Zweig*, 548 F.2d 1347, 1354 (9th Cir. 1977).  As shown below, the crime-fraud exception clearly applies to defeat

1 any attorney-client privilege or work product protection that would otherwise apply

2 in this case.

3 **2.   THE PARTIES AND THE CLAIMS**

4     **2.1   The Plaintiffs**

5        There is one natural individual plaintiff, Busbice.  The other two plaintiffs

6 are Busbice's closely-held limited liability companies, Ollawood Productions, LLC

7 (formerly Olla Productions, LLC) ("Olla") and Ecibsub, LLC ("Ecibsub").  Olla's

8 sole member is Busbice.  Ecibsub's only members are Busbice and his family.  (*See*

9 Prouty Decl., ¶¶ 1-3, and Exhibit 1 thereto (the Complaint) at ¶¶ 12-14.)

10     **2.2   The Defendants**

11        There are eleven Defendants, and each generally falls into one of three

12 categories:  (1) the "Individual Defendants;" (2) the "Investment-Entity

13 Defendants" (all alleged to be alter egos of defendant James David Williams

14 ("Williams") and of each other); and (3) the "Transferee-Entity Defendants" (also

15 all alleged to be alter egos of Williams and of each other).  All Defendants are

16 represented by the same attorney in this lawsuit.  (Prouty Decl., ¶¶ 8-9.)

17        The Individual Defendants:  The Complaints in this consolidated action name

18 four natural individual defendants:  (1) Williams; (2) Steven J. Brown ("Brown");

19 (3) Gerald R. Seppala ("Seppala"); and (4) attorney Reiss.  Each of these

20 Defendants are alleged to have knowingly and willfully conspired and agreed

21 among themselves to fraudulently induce Plaintiffs to make the alleged investments

22 totaling $10,900,000.  (Prouty Decl., ¶ 10, and Exhibit 1 thereto at ¶ 176.)

23        The Investment-Entity Defendants:  The following three Defendants fall into

24 the "investment-entity" category, because they are entities into which Plaintiffs

25 supposedly were investing:  (1) Visions, LLC ("Visions"); (2) Luxe One, Inc.

26 ("Luxe One"); and (3) Moment Factory, LLC ("Moment Factory").  These entities

27 were created and dominated by the Individual Defendants in order to carry out their

28 conspiracy to defraud.  Each is alleged to be the alter ego of Williams and of each

TROUTMAN  SANDERS  LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA  92614 -2545

24871305

- 3 -

other.  (*Id.* at ¶ 96.)  Each of the Investment-Entity Defendants received investment funds directly from Plaintiffs and no one else, notwithstanding Defendants' fraudulent representations and documentation that they and/or other investors had already contributed substantial funds.  Defendants quickly thereafter caused the entities to transfer, commingle and dissipate the funds.  (*Id.* at ¶¶ 75-83, 89-95.)

The Transferee-Entity Defendants:  The following four Defendants fall into the "transferee-entity" category, because they secretly and knowingly received fraudulent transfers of Plaintiffs' money from the other Defendants:  (1) Legacy Film Crest, LLC ("Legacy"); (2) Bipartisan Coalition for American Security Corporation ("Bipartisan Coalition"); (3) Highgate Pass, LLC ("Highgate"); and (4) Garuda Partners, Ltd. ("Garuda").  (*Id.* at ¶¶ 75-83, 89-95, 222-224, 227-228.)  Each is alleged to be the alter ego of Williams and of each other.  (*Id.* at ¶ 96.)

### 2.3  The Claims

Plaintiffs allege federal securities fraud, common law fraud and conversion.  Plaintiffs also allege that all of the Defendants have actively participated in the conspiracy to defraud, and are jointly and severally liable for Plaintiffs' damages.  Plaintiffs also allege constructive trust and fraudulent transfer claims to recover from the fraudulent transferees.  (Prouty Decl., ¶¶ 3-4, 13, and Exs. 1-2 thereto.)

## 3.  THE FRAUDULENT INDUCEMENT

### 3.1  *Made in America* / Visions, LLC

In April 2013, defendant Seppala approached plaintiff Busbice regarding an opportunity to invest in a feature length documentary, *Made in America*, and introduced Busbice to defendant Williams.  Seppala and Williams proposed an investment through the purchase of membership units in Visions, a limited liability company organized as the film's project management, development and financing entity.  Busbice was told that Seppala and defendant Brown were the film's producers, and that Seppala's company, Griffin Productions, which had developed the film, assigned all of its rights regarding the film to Visions.  (Declaration of Bill

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA  92614 -2545

A. Busbice, Jr. ("Busbice Decl."), ¶ 2.)

Seppala presented a budget and represented that the minimum financing needed for the film was $1,000,000.  Seppala falsely told Busbice that Williams would invest $500,000 of his own money to purchase membership interests in Visions, if Busbice would agree to invest the other $500,000 on an equal basis. Seppala told Busbice that this was a special opportunity because Williams was a prominent Hollywood executive and financier and did not typically invest in projects as small as *Made in America*.  (*Id.*, ¶ 3.)

On April 15, 2013, Seppala sent Busbice an e-mail attaching a purported wire confirmation ("Purported 4/15/13 Wire Confirmation") reflecting that Williams transferred $500,000 to a Chase bank account opened for Visions, Account No. 478137206 (the "Visions 7206 Account"), which was represented to be the production account for the *Made in America* project.  (*Id.*, ¶ 4, Ex. A.)

On April 25, 2013, as part of the "closing" of this investment, Seppala and Williams provided Busbice and his attorney with, *inter alia*:  (1) a purported printout of a Chase online statement for the Visions 7206 Account reflecting that, as of April 24, 2013, the account's present balance was $531,610.12 (the "Purported 4/24/13 Screenshot"); and (2) a copy of a Subscription Agreement, signed by Williams, representing that Williams was acquiring units in Visions for $500,000, and which contained an acknowledgement, signed by Seppala, certifying that Visions had already received Williams' $500,000 "by way of wire transfer into the checking or deposit account of Visions, LLC[.]"  (*Id.*, ¶¶ 5-6; Exs. B-C.)

On April 26, 2013, in direct reliance on these representations, Busbice caused Ecibsub to wire transfer $500,000 to the Visions 7206 Account.  (*Id.*, ¶ 7.)

It was only much later – in May 2014 – that Plaintiffs discovered that Defendants' representations were false.  Among many other things, genuine bank statements produced by Chase in this action confirm that neither Williams, nor any other person or entity, had ever deposited or transferred <u>any</u> money into the Visions

1  7206 Account.  (Prouty Decl., ¶¶ 15-19; Exs. 4-6; Busbice Decl., ¶ 8.)  Indeed, the

2  Visions 7206 Account had a zero balance when Busbice transferred his $500,000

3  into that account.  (*Id*.)  Thus, Seppala's acknowledgment in the Subscription

4  Agreement that he already had received Williams' $500,000 "by way of wire

5  transfer into the checking or deposit account of Visions, LLC" was false.  Even

6  worse, the Purported 4/15/13 Wire Confirmation and the Purported 4/24/13

7  Screenshot were not only false, but were physically and fraudulently created by

8  Defendants and transmitted to Plaintiffs to induce Plaintiffs' "investment."

9          On the same day that Busbice wire transferred his $500,000 into the Visions

10  7206 Account (Friday, April 26, 2013), $450,000 was immediately transferred to

11  another Chase account held in the name of defendant Legacy, an entity owned and

12  controlled by defendant Williams.  (Prouty Decl., ¶¶ 39-40; Ex. 15.)  The following

13  Monday (April 29th), another $35,000 of Busbice's investment was transferred out

14  of the Visions 7206 Account into the Legacy account.  (*Id*.)  The Legacy account

15  had a negative balance when these transfers from the Visions 7206 Account were

16  made.  Thereafter, Defendants treated the account as a personal piggy bank,

17  spending Plaintiffs' money on various personal and unauthorized items.  (*Id*., ¶ 41.)

18          Plaintiffs never agreed that any part of their $500,000 investment could be

19  used for anything other than for co-funding *Made in America*'s production budget.

20  To date, Plaintiffs have seen no evidence that the documentary was ever produced,

21  and they have received no accounting of their investment.  (Busbice Decl., ¶ 9.)

22          Although he was not visibly dealing with Plaintiffs on this deal, Defendants

23  have produced an invoice, dated April 29, 2013, from defendant Reiss to Visions in

24  the amount of $10,000 "[f]or full transactional legal services and industry advice

25  and counsel with respect to the pre-production phase of the theatrical motion

26  picture currently entitled 'Made in America.'"  (Prouty Decl., ¶ 91, Ex. 45.)

27      **3.2    *The Letters*, Part I / Luxe One, Inc.**

28          Having succeeded in duping Busbice to make a $500,000 investment,

TROUTMAN  SANDERS  LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA  92614 -2545

- 6 -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA 92614 -2545

1   Defendants upped the ante.  In June 2013, Williams approached Busbice regarding

2   an investment opportunity that involved the making of a prints & advertising

3   ("P&A") loan in connection with the theatrical release of *The Letters*, a feature film

4   about the life of Mother Teresa.  Williams represented that he had an agreement in

5   place with the owner/producer of *The Letters*, Big Screen Entertainment Partners V

6   ("Big Screen"), to make a $10,000,000 P&A loan for the film, which was to be

7   repaid with interest from the film's net revenues, and which was to be secured in a

8   first position by such revenues.  (Busbice Decl., ¶ 10.)

9   Williams also represented to Busbice that he already had advanced

10  $2,000,000 of his own money to Luxe One (through his entity New Legacy Film

11  Investment ("NLFI")), and had obtained a $6,000,000 payment to Luxe One from

12  Chart Investment Fund CV12 ("Chart"), which Williams represented was an entity

13  controlled by certain clients of his, with which he had done many successful P&A

14  deals in the past.  (*Id*., ¶ 11.)  Thus, according to Williams, only $2,000,000

15  remained in order to complete the $10,000,000 P&A loan investment, and Williams

16  sought that amount from Busbice.  (*Id*.)

17  In late June 2013, Busbice organized Olla as the vehicle for his investment in

18  Luxe One.  (*Id*., ¶ 12.)  In early July 2013, Williams provided Busbice with an

19  agreement between Olla and Luxe One (the "Letters Term Sheet"), which was

20  signed by Williams on Luxe One's behalf, and contained provisions governing

21  Olla's $2,000,000 contribution, as well as certain of Luxe One's representations

22  regarding the overall P&A investment.  (*Id*., ¶ 13, Ex. D.)  Among other things, the

23  Letters Term Sheet stated that Plaintiffs' investment was "fully dedicated to" *The*

24  *Letters*, and that the Luxe One corporate account to which Defendants instructed

25  Plaintiffs to wire their investment funds was "for the sole use of paying for the

26  distribution costs and expenses of" *The Letters*.  (Ex. D to Busbice Decl., at p. 1.)

27  By email dated July 3, 2013, Williams sent Busbice a purported screen shot

28  of the Luxe One Chase bank account showing a balance as of July 2, 2013 of

1   $8,003,150.24 (the "Purported 7/2/13 Luxe One Screenshot").  (*Id*., ¶ 14, Ex. E.)

2   Later that day, in direct reliance upon Williams' representations, Busbice wire

3   transferred $2,000,000 to that account, as instructed by Williams.  (*Id*., ¶ 15.)

4         Again, it was not until May 2014 that Plaintiffs discovered that these

5   representations were fraudulent.  Among many other things, neither Williams, nor

6   any other person or entity, had ever deposited or transferred any money into the

7   Luxe One account.  (Prouty Decl., ¶¶ 20-21; Exs. 7; Busbice Decl., ¶ 16.)  Thus, the

8   Purported 7/2/13 Luxe One Screenshot showing that the Luxe One account

9   contained more than $8 million was fraudulently created to induce the investment.

10        Plaintiffs never agreed that any part of their $2,000,000 investment into Luxe

11  One could be used for any purpose other than as part of a $10 million dollar P&A

12  loan for the marketing and distribution of *The Letters*.  (Busbice Decl., ¶ 17.)

13  **3.3     *Left Behind***

14        The con-artistry continued.  On August 8, 2013, Williams e-mailed Busbice

15  regarding an opportunity to invest $2,400,000 in the film *Left Behind*, for interest

16  and ownership of "10% of the Worldwide Revenue from the film[.]"  (*Id*., ¶ 18, Ex.

17  F.)  According to Williams, *Left Behind* was in production and was "based on the

18  LEFT BEHIND books which have sold 68 million copies . . . second only to

19  HARRY POTTER AND TWILIGHT."  Williams represented that he "put up $18

20  million from [his] PandA group for Prints and Advertising[,]" that the film had a

21  $15,000,000 production budget, and that Williams was funding most of that by

22  himself.  However, Williams represented that he was "in a bind on" the movie,

23  because he was $2,400,000 short, and although he could borrow against some of his

24  holdings, that "takes time."  Williams further represented that there were "about six

25  investors that have come in wanting to invest," but that he "just ha[dn't] had the

26  time to fly around an [sic] meet with them all."  Williams stated that Busbice was

27  "the first person that [he] thought of" and advised Busbice to "[k]eep in mind that

28

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

24871305

- 8 -

the first three movies in the franchise . . . starring Kirk Cameron  . . . made well over $100 million dollars, and this one stars Nicolas Cage." (*Id.*)

Based on Williams' solicitation, Busbice expressed interest in *Left Behind* and told Williams that he could invest through his company, Olla. (*Id.*, ¶ 19.)  On August 11, 2013, Williams sent Busbice an agreement entitled "Left Behind – Participating Loan Agreement" (the "Left Behind Agreement"), purportedly governing that investment and Olla's participation rights in the film. (*Id.*)

On August 12, 2013, Williams e-mailed Busbice wire instructions for the *Left Behind* investment and stated:  "[o]nly send the $2,400,000 (not the $2,500,000 as outlined in the Agreement).  We'll settle that up later.  Thanks." (*Id.*, ¶ 20.) Later that day, Busbice wire transferred $2,400,000 to a Chase bank account of Left Behind Investments, LLC ("LBI") as Williams instructed, expecting that the investment would be recorded directly in Olla's name, as investor. (*Id.*, ¶ 21.)

In May 2014, Plaintiffs discovered that the film's producers had no record of any investment in Busbice's or Olla's name, and that Williams had arranged for Plaintiffs' wire transfer to be recorded as an investment by some entity called "The FBTR Family Trust." (*Id.*, ¶ 22, Ex. G.)  Plaintiffs also discovered that Williams' representations regarding his own investments in *Left Behind* were false and that he had never invested any of his own money in *Left Behind* but instead transferred money that Busbice invested in other entities for other pictures (*i.e.*, *The Letters* and *Angels Sing*, discussed below), and had those transfers registered as investments for his own account or benefit. (*Id.*)  Exhibit G to the Busbice Decl. is a letter dated July 3, 2014, written by LBI's attorney to Williams, which outlines some of the "extremely disturbing facts" that LBI learned concerning Williams' actions. (*Id.*) Defendants have yet to explain their actions.

### 3.4   *Angels Sing* / Moment Factory, LLC

In October 2013, Williams approached Busbice regarding another P&A loan investment opportunity, this time in connection with *Angels Sing*, a Christmas-

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA  92614 -2545

themed feature film.  (*Id.*, ¶ 23.)  According to Williams, he had set up Moment

Factory for this investment, and was negotiating a deal with the film's master

distributor, DF Indie Studios LLC, to make a $4,000,000 P&A loan for *Angels*

*Sing*.  The loan proceeds were to be fully dedicated to the P&A for *Angels Sing* and

were to be repaid, with interest, from the film's net revenues, secured in a first

priority position by net revenues from all media and sources.  In addition, the deal

provided "back end" participation rights in the film's net profits.  (*Id.*, ¶ 23;

Declaration of Michael D. Friedman ("Friedman Decl."), ¶ 2.)

In connection with this proposed investment, Busbice was represented by an

attorney, Michael D. Friedman, who dealt with Williams/Moment Factory's

attorney, defendant Reiss.  (*Id.*, ¶ 24; Friedman Decl., ¶ 2-3)

Williams and Reiss repeatedly represented that Williams (through his

wholly-owned company, Legacy) had already funded $2,000,000 into Moment

Factory's bank account for the deal, and further represented that if Busbice

contributed $2,000,000, then the two would each be invested 50%-50% as equal

members of Moment Factory.  (Busbice Decl., ¶ 23; Friedman Decl., ¶ 4.)

Williams and Reiss stated on numerous occasions that all funds invested into

the Moment Factory account would be used solely for P&A expenditures for the

film *Angels Sing*.  Williams and Reiss also advised that key agreements had been

reached with the film's producers and distributors and that the $4,000,000 was

needed to market *Angels Sing* in various channels of distribution for the upcoming

holiday season.  They also provided Plaintiffs with a marketing plan for the

theatrical release of the film on at least 1,000 screens.  (Friedman Decl., ¶ 5.)

Plaintiffs requested confirmation that Williams (through Legacy) had

contributed his half of the $4,000,000 amount.  In response, both Williams and

Reiss represented that Williams (through Legacy) had in fact made the $2,000,000

cash contribution, and on October 29, 2013, Reiss sent an e-mail to Plaintiffs'

attorney attaching what purported to be a Chase online statement reflecting Moment

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Factory's bank account's balance from the day before (the "Purported 10/28 Moment Factory Balance Statement"). The Purported 10/28 Moment Factory Balance Statement indicated that on October 28, 2013, the account balance was $1,903,150.24, supposedly representing the amount left from Williams' earlier purported $2,000,000 contribution. (*Id.*, ¶ 6, Ex. A; Busbice Decl., ¶ 25, Ex. H.)

On October 30, 2013, Williams, on Moment Factory's behalf, signed a Prints and Advertising Investment Lending Term Sheet ("Angels Sing Term Sheet") between Moment Factory and Olla, which contained provisions governing Olla's $2,000,000 contribution of the total $4,000,000 P&A loan, as well as various representations regarding the overall P&A loan/investment. (*Id.*, ¶ 8, Ex. B.) The Angels Term Sheet stated, among other things, that Plaintiffs' $2,000,000 investment was "fully dedicated" to the *Angels Sing* film, and that Moment Factory's "special purpose account at Chase Bank . . . is for the sole use of paying for the distribution costs and expenses of the Picture [*i.e.*, *Angels Sing*] in accordance with the Prints and Advertising Plan and the Marketing Plan established in connection with the Picture." (Ex. B to the Friedman Decl. at p. 1.)

On that same day, October 30, 2013, in reliance upon Williams' and Reiss's representations that Williams (through Legacy) had contributed $2,000,000 for the deal, Busbice, through Olla, wire transferred $2,000,000 to Moment Factory's Chase account. (Busbice Decl., ¶ 25; Friedman Decl., ¶ 9.)

Once again, Plaintiffs discovered later that such representations were false. Among many other things, the Purported 10/28 Moment Factory Balance Statement was phony – neither Williams, nor any other person or entity, had ever deposited any money in Moment Factory's account. (Prouty Decl., ¶¶ 22-23; Ex. 8.)

Plaintiffs never agreed that any part of their $2,000,000 could be used for any purpose other than as part of a $4 million P&A loan for the marketing/distribution of *Angels Sing*. (Busbice Decl., ¶ 27.) However, as shown below, Defendants

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1  spent enormous sums of Plaintiffs' money on personal, unauthorized items having

2  nothing to do with *Angels Sing*.

3      **3.5    *The Letters*, Part II / Luxe One, Inc.**

4      Emboldened by their successful trickery to date, Defendants' final fraudulent

5  scheme was also the largest in terms of dollars involved.  In November 2013,

6  Williams informed Busbice that Luxe One's deal regarding *The Letters* had

7  improved to their advantage.  Specifically, Williams represented that because *The*

8  *Letters* was viewed as such a strong film, Luxe One was given the opportunity to

9  loan up to $22,000,000 for the film's P&A spend.  Williams claimed to have

10  negotiated the new and enhanced deal with Big Screen, and he informed Busbice

11  that Luxe One needed to raise an additional $12,000,000 to carry out the deal.

12  Williams represented that both Chart and NLFI (Williams' own company) were

13  each contributing an additional $4,000,000, but that an additional $4,000,000 was

14  needed from Busbice.  (Busbice Decl., ¶ 28; Friedman Decl., ¶ 12.)

15      In connection with this proposed expansion of the Luxe One investment in

16  *The Letters*, Plaintiffs again were represented by attorney Friedman, who dealt with

17  Williams/Luxe One's attorney, Reiss.  (Busbice Decl., ¶ 29; Friedman Decl., ¶ 13.)

18      Throughout December 2013, Williams, directly and through Reiss, pressed

19  Busbice for the additional $4,000,000.  Both Williams and Reiss insisted that the

20  total $22,000,000 had to be fully funded by the end of the year, because the film

21  was scheduled to be released in early April 2014, and the producer and distributors

22  were demanding immediate confirmation that the full $22,000,000 was in the bank.

23  (Busbice Decl., ¶ 30; Friedman Decl., ¶ 14.)

24      In response to such claims, Plaintiffs requested confirmation that both Chart

25  and Williams' company, NLFI, paid their respective additional $4,000,000

26  contributions, and that the total sum of $18,000,000 had been funded into Luxe

27  One.  (Busbice Decl., ¶ 31; Friedman Decl., ¶ 16.)  On December 16, 2013, Reiss

28  sent Plaintiffs' attorney an e-mail confirming, *inter alia*, that Chart had invested its

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
DETERMINATION OF APPLICATION OF CRIME-FRAUD EXCEPTION

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA 92614 -2545

1   additional $4,000,000, bringing its total contribution to $10,000,000, and that NLFI

2   funded an additional $4,000,000, bringing its total contribution to $6,000,000.

3   (Friedman Decl., ¶ 17, Ex. D.)  And on December 18, 2013, Williams sent

4   Plaintiffs' attorney an e-mail (copying Reiss), attaching what was represented to be

5   a Chase online statement reflecting Luxe One's bank account's balance from the

6   day before (the "Purported 12/17 Luxe One Balance Statement").  The Purported

7   12/17 Luxe One Balance Statement showed that on December 17, 2013, the present

8   balance of Luxe One's Chase account was $18,014,609.46.  (*Id*., ¶ 18, Ex. E.)

9   Later that same day, Williams and Reiss again confirmed that the total funding of

10  $16 million dollars by Chart and NLFI into Luxe One had been completed.  (*Id*.)

11  Over the final two weeks of 2013, Williams and Reiss continued to press

12  mightily for the additional $4,000,000 investment from Busbice, stating repeatedly

13  that Chart and Williams had funded their share of the overall investment, stressing

14  the urgency of the situation and that Busbice was the only investor who had not

15  completed funding.  Reiss even requested that Busbice wire the $4,000,000 to the

16  Williams-controlled Luxe One account before the final amended loan agreement

17  relating to the increased funding was completed.  (*Id*., ¶ 20.)

18  On December 31, 2013, Williams signed on Luxe One's behalf, an

19  amendment to the Letters Term Sheet (the "Amended Letters Term Sheet"), which

20  was to govern Olla's further investment, and which made various representations

21  regarding the overall P&A loan/investment.  (*Id*., ¶ 21, Ex. F.)

22  On January 2, 2014, in direct reliance on the various representations made by

23  Williams and Reiss, including the Purported 12/17 Luxe One Balance Statement,

24  Busbice, through Olla, wire-transferred $4,000,000 to Luxe One's Chase account.

25  (Busbice Decl., ¶ 34; Friedman Decl., ¶ 22.)  As with the other "investments," it

26  was discovered that the Purported 12/17 Luxe One Balance Statement was phony –

27  instead of having $18,014,609.46 on December 17, 2014 as represented, the Luxe

28  One account actually had only $112,945.09 on that date, and that was simply what

1   remained of Plaintiff's initial $2,000,000 investment.  (Prouty Decl., ¶¶ 24-25, Ex.

2   9.)  Neither Williams nor Chart contributed to Luxe One.  Furthermore, it appears

3   that Chart's very existence was a complete fabrication.  (Friedman Decl., ¶ 19.)

4   **4.      THE CONVERSION AND FRAUDULENT TRANSFERS**

5          **4.1      The Secret Luxe One Account Misappropriated by Steven Brown**

6          As the records Chase produced confirm, there were two Chase accounts held

7   in the name of Luxe One.  One ends in 2939 and is referred to herein as the "Luxe

8   One 2939 Account."  The Luxe One 2939 Account was the disclosed corporate

9   account and the one into which Plaintiffs wire transferred their funds as instructed.

10  The other Luxe One account, which was concealed from Plaintiffs, ends in 1572

11  and is referred to herein as the Luxe One 1572 Account.  (Prouty Decl., ¶ 29.)

12         Records produced by Chase confirm that more than $1 million flowed into

13  the secret Luxe One 1572 Account directly from either the Luxe One 2939 Account

14  or the Moment Factory Chase account, both of which were funded exclusively by

15  Plaintiffs.  Chase's records also confirm that defendant Brown had control over the

16  Luxe One 1572 Account.  Indeed, the records confirm that Brown used the money

17  in that account for his own personal use and enjoyment and signed for and made

18  repeated withdrawals and transfers of substantial sums of money during the year

19  that the account was active.  (*Id.*, ¶¶ 30-35, Ex. 12.)

20         Among the transfers made by Brown from the Luxe One 1572 Account were

21  transfers of at least $238,000 to the Chicago-based law firm of Collins, Bargione &

22  Vuckovich, whose website indicates that five-lawyer firm's practice groups include

23  criminal defense, and civil and criminal RICO actions.  (*Id.*, ¶ 37, Exs. 13-14.)

24         **4.2      Transfers to and From the Williams-Controlled Legacy Account**

25         Chase's records also show that at least $1 million was transferred into a

26  Chase account held by defendant Legacy directly from all three of the subject

27  investment-entity accounts.  (*Id.*, ¶¶ 39-40, Ex. 15.)  Before these transfers into the

28  Legacy account, it had a negative balance.  (*Id.*)  Much like Brown's treatment of

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA  92614 -2545

24871305

- 14 -

1    the secret Luxe One 1572 Account, Williams treated the Legacy account as a

2    personal piggy bank, spending large sums on things such as luxurious vacations, his

3    children's private school tuition, and yacht club membership fees.  (*Id.*, ¶ 41.)

4        **4.3    Over $700,000 is Used to Purchase Vacant Land in Calabasas**

5        Defendants fraudulently transferred over $700,000 of Plaintiffs' money

6    contained in Moment Factory's Chase account to purchase land in Calabasas (the

7    "Calabasas Property") in the name of Defendant "Garuda Partners, Ltd., as Trustee

8    of the Mulholland Ridge Trust."  (Prouty Decl., ¶¶ 42-52.)

9        **4.4    Fraudulent Transfers to the other Transferee-Entity Defendants**

10           **4.4.1  Bipartisan Coalition**

11       Chase's records show that Bipartisan Coalition, a Williams-controlled

12   corporation, received at least $110,000 from the Luxe One 2939 Account in July-

13   August 2013.  (*Id.*, ¶¶ 53-56, Ex. 25.)  At least $21,000 of that money was then

14   transferred to the secret Brown-controlled Luxe One 1572 Account.  (*Id.*)  On

15   August 6, 2013, there were two wire transfers of $43,000 each made from the

16   Bipartisan Coalition account – one apparently having something to do with former

17   Senator Joseph Lieberman, and one apparently having something to do with former

18   Senator Scott Brown.  (*Id.*)  On July 23, 2014, after this lawsuit was filed, Williams

19   closed the account and withdrew the remaining $2,845 in cash.  (*Id.*)

20       Defendants have represented to the Court that Bipartisan Coalition "is a non-

21   profit that was formed as a means to obtain political support for *Made in America*."

22   (Dkt. 43 at 6:5-7.)  However, the money that Defendants transferred into the

23   Bipartisan Coalition account came from the Luxe One account that was for the

24   investment in *The Letters* – not *Made in America*.  Defendants never disclosed,

25   accounted for, or explained these transfers.  (Prouty Decl., ¶ 56.)

26           **4.4.2  Highgate**

27       More than $175,000 was transferred to Highgate, a Williams-controlled

28   entity, directly from the Luxe One 2939 Account and the Moment Factory Chase

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
DETERMINATION OF APPLICATION OF CRIME-FRAUD EXCEPTION

account, both of which were funded by Plaintiffs.  (Prouty Decl., ¶¶ 57-59, Ex. 26.)

Defendants have represented to this Court that Highgate is "a company that was to provide media booking for some of the movie projects."  (Dkt. 43 at 5:25-26.)

However, Defendants have failed to produce documents explaining these transfers or, more generally, Highgate's role, activities, or services regarding the subject film investments.  (Prouty Decl., ¶ 60.)

### 4.5    Plaintiffs' Money has Been Traced to the Post-Lawsuit Purchase of Williams' Luxury Home

Defendant Williams used over $240,000 of Plaintiffs' money for the purchase of a $3.5 million house in Calabasas, which closed on September 15, 2014, after this lawsuit was filed.  Williams had signed a lease with an option to purchase the property in June 2013, shortly before Busbice made his second investment.  He signed that lease "on behalf of the Garuda Trust," and made monthly rental payments of $16,000 from the Luxe One 2939 Account, which were applied to the purchase.  Before the sale closed, Williams assigned his rights under the lease from the "Garuda Trust" to Mirada Park, LLC (a limited liability company ostensibly managed by Williams' wife, Kammie Williams), which ultimately acquired the property.  (Prouty Decl., ¶¶ 61-68, Exs. 27-33.)

### 4.6    Plaintiffs' Money Also Has Been Used to Pay for a Yacht and Vacations, as Well as for Many Other Unauthorized Purposes

Records produced by Chase and Residential Fund 118, LLC in this action reveal that $89,394.20 from the Luxe One 2939 Account was used to purchase a 75 foot yacht.  According to the documents produced, the purchaser was "The Garuda Trust" and the purchase agreement was signed by "J. David Williams."  (*Id.*, ¶¶ 69-72, Exs. 34-35.)  Chase records also reflect that tens of thousands of dollars were diverted from Luxe One to "Marriot Ownership Resorts, Inc."  (*Id.*, ¶ 73, Ex. 36.)  These are just a few of the many examples of the unauthorized and fraudulent transfers apparent from bank records produced to date.

TROUTMAN  SANDERS  LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA  92614-2545

## 5.     THE FRAUDULENT COVER UP

From January through the first half of March 2014, Plaintiffs repeatedly asked Defendants to provide information to verify the *bona fides* of the Luxe One and Moment Factory investments.  However, Defendants largely ignored these requests or stalled and made excuses.  (Busbice Decl., ¶ 37.)  On occasion during this time period, Williams and Brown met with Busbice in person and showed him fabricated bank statements and financial information and told him that due to "confidentiality concerns" they could not be provided to his accountant.  (*Id*., ¶ 41.)

### 5.1     The Mysterious (and Fictional) Carol Martin Provides Phony Accounting and Financial Information in March 2014

On March 19, 2014, Busbice received a letter addressed to his accountant, Joan Martin, from someone identified as "Carol Martin" on Legacy letterhead (the "3/19/14 Letter").  The 3/19/14 Letter purported to enclose Quick Book Reports and purported Chase bank statements for July-December 2013 for the Luxe One 2939 Account (hereinafter, the "Purported Luxe One July-Dec. Financial Records").  (Busbice Decl., ¶ 38; Ex J.)  The 3/19/14 Letter represented that "the same information regarding Moment Factory" would be sent later in the week.  However, that information was never provided.  (*Id*., ¶ 39.)

Chase's records confirm that the Purported Luxe One July-Dec. Financial Records were fraudulently prepared to cover-up Defendants' theft and conversion.  (Prouty Decl., ¶¶ 75-77, Ex. 37.)  There are great disparities between the purported records and genuine records, not only in terms of the account's beginning and ending balances, but also with regard to the individual transactions reflected on the statements.  For example, according to the Purported Luxe One July-Dec. Financial Records, the first of the "Checks Paid" from the Luxe One 2939 Account on the July 2013 statement was Check No. 97 in the amount $9,394.20 to "Blue Room Post Production, Inc."  However, according to the genuine bank records, Check No. 97 was the aforementioned transfer in the amount of $89,394.20 to purchase the 75

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA  92614 -2545

foot yacht.  (Prouty Decl., ¶ 78.)  The phony records also scrubbed evidence of many other unauthorized personal expenditures and transfers.  (*Id*.)

And, as so often happens when webs of deception are spun, Defendants got tangled in their own lies.  Whereas the Purported 12/17 Luxe One Balance Statement sent to Plaintiffs in December 2013 represented that the Luxe One 2939 Account contained $18,014,609.46 on December 17, 2013, the Purported Luxe One July-Dec. Financial Records sent to Plaintiffs in March 2014 represented that the account had $9,539,128.20 on that date.  Of course, both of those statements were lies – there actually was only $112,945.09 in the account at the time.  (*Id*., ¶ 79.)

**5.2    Defendants Provide Busbice with Further Phony Bank Records**

On March 28, 2014, Busbice was provided with what were represented as being Luxe One's Chase account statements for January and February 2014 (the "Purported Luxe One Jan-Feb Statements").  (Busbice Decl., ¶ 40, Ex. K.)  Just like the phony Luxe One statements provided for July-December 2013, the Purported Luxe One Jan-Feb Statements conflict significantly with the genuine bank statements produced by Chase.  (Prouty Decl., ¶¶ 80-82, Ex. 38.)  For example, the fake records reflect that the account's ending balance for February 2014 was $19,713,796.12 – but in reality it was only $1,853,783.84.

**6.    DEFENDANTS' ATTEMPTS TO EXPLAIN THE FRAUD AFTER IT WAS EXPOSED ARE THEMSELVES FALSE AND FRAUDULENT**

**6.1    Williams Spins an Incredible Tale in an Attempt to Explain the Purchase of the Calabasas Property; But Documents Produced by the Title Company Expose the Lies on Top of Lies**

In February 2015, after the Complaint was filed, in an arbitration proceeding involving *The Letters* (to which Plaintiffs are not parties), Williams provided testimony regarding the allegations in Plaintiffs' Complaint about the purchase of the Calabasas Property.  Williams' incredible explanation was that he was using the money in the Luxe One account (which was supposed to be used to fund P&A for

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

*The Letters*) to purchase land, so that the land could be used as collateral for loan proceeds, which in turn could be used to fund P&A loans.  (Prouty Decl., ¶ 43; Ex. 16.)  How that inane proposition was going to work was never explained.

Documents produced by First American Title Company ("Title Company") pursuant to a subpoena issued in this action, however, reveal the following:

- Williams used more than $700,000 from Moment Factory's account to purchase the Calabasas Property in the name of Defendant "Garuda Partners, Ltd., as Trustee of the Mulholland Ridge Trust."

- Williams submitted a letter to the Title Company representing that "J. David Williams is the Acting General Manager and Controller of Garuda, Ltd.  Garuda, Ltd. is a Limited Partnership formed in Luxembourg. . . . As the Acting Trustee of the Mulholland Ridge Trust, he is authorized to sing [sic] and act on behalf of Garuda, Ltd."

- The beneficiaries of The Mulholland Ridge Trust *are Williams' children*.

- The seller had a concern that the purchase money was coming from Moment Factory instead of the buyer, but that concern was alleviated when it was represented to him:  "Moment Factory is a service that David uses for domestic funds wiring.  He transferred his funds into Moment Factory and they wire the funds out at no cost.  So it would seem it is a non-issue."

(Prouty Decl., ¶¶ 44-52; Exs. 17-24.)

Setting aside the fact that Williams' explanation for the land purchase (*i.e.*, using marketing money to buy land to use as collateral for a loan to use for marketing money) makes no sense, the dishonest explanation grows even more incredible in light of the fact that the Calabasas Property was purchased by an off-shore entity owned and controlled by Williams, as Trustee, for his own children.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

### 6.2   Williams' Attempt to Blame the Fictional and Unreachable Carol Martin is Comical – Until it is Remembered that it is a Despicable Excuse to Evade Responsibility for the Theft of Nearly $11 Million

In his February 2015 arbitration testimony, Williams provided an equally incredible explanation for the fraudulently created and false bank statements and accounting information provided by Defendants to Plaintiffs.  (Prouty Decl., ¶ 83, Ex. 39.)  Specifically, Williams claimed:

- "Carol Martin" was "a private contractor" who worked for Williams for a couple years and handled his bookkeeping and accounting;

- Chart (another purported investor in Luxe One) had real money in some *other* Chase bank account, (information about which has not been produced);

- The statements sent to Plaintiffs were false in that the corporate accounts did not have the balances indicated on the statements, but . . .

- Although Williams himself had no control over or access to Chart's money or bank account, "Carol Martin" was somehow able to use some vague and unspecified power to aggregate money from the different accounts and make it look like it was in one account.  (*Id*.)

When the Arbitrator asked Williams the obvious, "[w]hat was her motive to do that?," Williams could only muster:  "She was, you know, to be paid a fee.  She was a private contractor who I had utilized."  (*Id*.)

Although Williams allegedly worked closely with "Carol Martin" from 2012 to 2014, he apparently (and conveniently) can no longer locate her.  (*Id*.)  Plaintiffs have asked Defendants to provide all current or last known contact information for Carol Martin, but Defendants have been unable to do so.  (*Id*., ¶¶ 84-88, Ex. 43.)

### 6.3   The Only Accountings Provided Have Been Demonstrably False

Faced with the reality that Plaintiffs now had genuine bank records of the investment entities' accounts, Williams, while testifying in the aforementioned arbitration proceeding, has recently asserted that although he took enormous sums

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

24871305

- 20 -

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
DETERMINATION OF APPLICATION OF CRIME-FRAUD EXCEPTION

of Plaintiffs' money for his own benefit, he intended to treat those amounts as "loans" from the entities, which he would repay with interest.  (*Id.*, ¶ 89, Ex. 44.)

One would expect there to be a detailed accounting of the investment entities' uses and transfers of the millions invested.  That would be particularly true if Williams truly did intend to repay any "loans" that he received from the entities. However, although it was formally requested in discovery back in September 2014 (after many months of informal pre-lawsuit demands), no true and complete accounting has been produced.  (*Id.*, ¶ 90.)

## 7.   THE CRIME FRAUD EXCEPTION CLEARLY APPLIES

"[A]ll reasons for the [attorney-client] privilege are eviscerated when a client consults an attorney for legal assistance to carry out a contemplated or ongoing crime."  *In re Grand Jury Proceedings*, 867 F.2d 539, 541 (9th Cir. 1989).

### 7.1   Federal Common Law Applies; But State Law is Similar

This action raises federal questions concerning violations of the federal securities laws, with pendent state fraud and conspiracy claims.  Where federal law supplies the rule of decision, federal common law applies to privilege issues, including application of the crime-fraud exception.  The result is the same where there are pendent state claims.  *Roberts v. Heim*, 123 F.R.D. 614, 622 (N.D. Cal. 1988); *see also Speaker v. County of San Bernardino*, 82 F. Supp. 2d 1105, 1108-09 (C.D. Cal. 2000); *Dunfee v. Truman Capital Advisors, LP*, 2013 U.S. Dist. LEXIS 165936, at *9 (S.D. Cal. Nov. 20, 2013).  However, California law and federal law regarding application of the crime-fraud exception are similar.

### 7.2   Elements of the Crime-Fraud Exception

"The crime-fraud exception to attorney-client privilege applies when [1] 'the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme,' and [2] where 'the attorney-client communications for which production is sought are 'sufficiently related to'" and were made "*in furtherance of* [the] intended, or present, continuing illegality."

TROUTMAN  SANDERS  LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA  92614 -2545

*Kismet Acquisition, LLC v. Diaz-Barba*, 755 F.3d 1130, 1141 (9th Cir. 2014) (emphasis in original; quoting *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007)); *see also* Cal. Evid. Code § 956 (under California law, "[t]here is no privilege . . . if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud").

"To defeat the attorney-client privilege, a *prima facie* case of the existence of the crime-fraud exception must be established." *In re Grand Jury Proceedings*, 867 F.2d at 541; *see also United States v. Friedman*, 445 F.2d 1076, 1086 (9th Cir. 1971) ("Future intended illegality or furtherance of present, continuing illegality need not be shown beyond a reasonable doubt before the privilege can be defeated; it suffices to make out a *prima facie* case.")

### 7.2.1  The Attorney Need Not Himself Be Aware of the Fraud

"[F]or the crime-fraud exception to apply, 'the attorney need not himself be aware of the illegality involved; it is enough that the communication furthered, or was intended by the client to further, that illegality.'" *In re Grand Jury Proceedings (Corporation)*, 87 F.3d, 377, 381 (9th Cir. 1996); *see also Everflow Tech. Corp. v. Millennium Electronics, Inc.*, 2013 U.S. Dist. LEXIS 4810, at *4 (N.D. Cal. Jan. 11, 2013) ("Under [California] Evidence Code § 956, the lawyer does not have to be aware of the fraud for the crime-fraud exception to apply. Instead, the application of the exception turns on the client's intent.").

### 7.3    The Exception's Scope Includes All Documents Reasonably Related to the Fraud, and Applies to Work Product As Well

Where the exception applies, documents "reasonably related to the fraud" are not protected from disclosure under the attorney-client privilege. *Cunningham v. Connecticut Mut. Life Ins.*, 845 F. Supp. 1403, 1415 (S.D. Cal. 1994).

Furthermore, "federal authority holds that the fraud exception applies to work-product privilege as well as attorney/client privilege." *Roberts*, 123 F.R.D. at 635; *United States v. Oettinger*, 1992 U.S. Dist. LEXIS 21087, at *3 n.2 (N.D. Cal.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA  92614 -2545

24871305

- 22 -

Sept. 2, 1992) ("The protection for attorney work product guaranteed by Rule 26(b)(3) of the Federal Rules of Civil Procedure is subject to the same crime-fraud exception as the attorney-client privilege.").

### 7.4 A Preponderance of the Evidence is All That is Needed to Bypass *In Camera* Review and Order Production of Documents

"To receive the benefit of outright disclosure based on the crime-fraud exception to the attorney-client privilege, [the plaintiff] must establish, by a preponderance of the evidence, that [the defendant] was engaged in or planning a criminal or fraudulent scheme at the time of its communications with [the attorney]. . . . It also must demonstrate that the attorney-client communications were sufficiently related to and in furtherance of the intended scheme." *SonicBlue Claims LLC v. Portside Growth & Opportunity Fund*, 2008 Bankr. LEXIS 181, at *33 (Bankr. N.D. Cal. Jan. 18, 2008) (citing *In re Napster, Inc. Copyright Litig.*, 479 F.3d at 1090); s*ee also Swortwood v. Tenedora de Empresas, S.A. de D.V.*, 2014 US Dist. LEXIS 29247, at *38 (S.D. Cal. Mar. 6, 2014) (applying California law and stating: "The party seeking discovery must establish the crime-fraud exception by a preponderance of the evidence.").

### 7.5 The Threshold is Much Lower to Trigger *In Camera* Review

Where a party seeks to trigger only an *in camera* review of documents to determine whether the exception applies, the evidentiary standard is "far less demanding" and requires only "reasonable cause" to believe the exception should be applied. *Dollar Tree Stores, Inc. v. Toyama Partners LLC*, 2011 U.S. Dist. LEXIS 125148, at *5 (N.D. Cal. Oct. 28, 2011) (quoting *In re Napster, Inc. Copyright Litig.*, 479 F.3d at 1096 and *United States v. Chen*, 99 F.3d 1495, 1503 (9th Cir. 1995)). "Reasonable cause" is "'more than suspicion but less than a preponderance of the evidence.'" *Id.*, 2011 U.S. Dist. LEXIS 125148, at *5.

### 7.6 The Evidence is Overwhelming That the Exception Applies

The evidence that Defendants committed a massive fraud in this case is both

- 23 -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1     direct and staggering.  Defendants lied to steal millions, and then lied to cover up

2     the fraud and conversion.  The falsity of the representations is clear, and in some

3     cases, formally admitted by Defendants in sworn discovery responses.  The money

4     trail and the Defendants' refusal or inability to provide a real accounting speaks

5     volumes.  And all of the post-lawsuit explanations are either already disproven or

6     so incredible, that they only serve to further incriminate Defendants.

7        There also can be no doubt that Defendants utilized attorney Reiss in

8     defrauding Plaintiffs.  Reiss was front and center with respect to the Moment

9     Factory/*Angels Sing* and Luxe One/*The Letters* investments.  Indeed, Reiss himself

10    transmitted the Purported 10/28 Moment Factory Balance Statement and made

11    several other misrepresentations to Plaintiffs' and/or their counsel regarding those

12    investments.  And it appears that Reiss operated behind the scenes with respect to

13    the earlier projects as well.  (Prouty Decl., ¶ 91, Ex. 45.)

14        During the parties' meet and confer sessions, Defendants' strategy has been

15    to delay the presentation of the issue to the Court, first by claiming that the issue

16    was premature, then by failing to timely respond to Plaintiffs' meet and confer

17    requests, and finally by suggesting that Plaintiffs should identify the precise

18    communications they were challenging and exclude all post-lawsuit

19    communications.  (Prouty Decl., ¶¶ 92-96.)

20        With regard to that last stratagem, Defendants are putting the cart before the

21    horse.  It is Defendants' burden to establish that a communication is initially

22    privileged, and Defendants have never, despite Plaintiffs' requests, articulated:  (a)

23    what matters for which Reiss was retained, and when; (b) who his clients were; (c)

24    who in fact engaged Reiss as counsel; and (d) the temporal and subject-matter

25    scope of such representations.  (*Id*., ¶¶ 95-96, Ex. 49.)  The fact that Reiss is a

26    lawyer and has represented Williams in certain matters in the past does not mean

27    that every communication with him is privileged; particularly communications well

28    after those matters apparently have ended.  In the context of this litigation, Reiss (a

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA  92614 -2545

transactional attorney) and the other Defendants, as far as anyone can tell, are merely co-defendants. Furthermore, the Complaint clearly alleges a continuing conspiracy, of which Reiss was and is a part, to conceal and misrepresent the true facts of the fraudulent scheme. Thus, to the extent that there are any post-lawsuit privileged communications between Reiss and his co-defendants responsive to plaintiffs' requests for production of documents (and Defendants have never made out a *prima facie* case that there are any privileged communications), the crime-fraud exception would apply to those communications.

**8.      THE REQUESTED RELIEF**

Plaintiffs are not seeking otherwise privileged communications between Defendants and their litigation counsel representing them in this case. Plaintiffs do, however, seek an order:

- determining that the crime-fraud exception applies to any other otherwise privileged communication or other document of or involving Reiss, including all such documents listed on the privilege logs attached to the Prouty Decl. as Exhibits 46-47 (*see* Prouty Decl., ¶ 96); and

- determining that the crime-fraud exception applies to any other otherwise privileged communication involving any other attorney who was consulted for the purpose of: (a) arranging, transacting and/or securing the subject film investments; (b) performing purported or actual legal work for any of the special-purpose investment entities (*i.e.*, Visions, Luxe One and Moment Factory) at any time; or (c) performing purported or actual legal work for any of the transferee entities controlled by Defendants relating in any way to the subject film investments.

Alternatively, in the unlikely event that the Court finds that a preponderance of the evidence does not establish application of the crime-fraud exception permitting outright production of documents to Plaintiffs, Plaintiffs request an *in camera* review of the documents to aid the final determination.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA 92614 -2545

24871305

- 25 -

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
DETERMINATION OF APPLICATION OF CRIME-FRAUD EXCEPTION

Dated:  April 13, 2015

Respectfully submitted,

TROUTMAN SANDERS LLP

By:  /s/ Thomas H. Prouty
     Paul L. Gale
     Thomas H. Prouty

Attorneys for Plaintiffs

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE , CA 92614 - 2545

24871305

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
DETERMINATION OF APPLICATION OF CRIME-FRAUD EXCEPTION