PAUL L. GALE, Bar No. 065873
paul.gale@troutmansanders.com
SIAVASH DANIEL RASHTIAN, Bar No. 228644
daniel.rashtian@troutmansanders.com
THOMAS H. PROUTY, Bar No. 238950
thomas.prouty@troutmansanders.com
TROUTMAN SANDERS LLP
5 Park Plaza, Suite 1400
Irvine, CA 92614-2545
Telephone: 949.622.2700
Facsimile: 949.622.2739

Attorneys for Plaintiffs
BILL A. BUSBICE, JR., OLLA PRODUCTIONS,
LLC, and ECIBSUB, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| BILL A. BUSBICE, JR., an individual; OLLA PRODUCTIONS, LLC, a limited liability company; and ECIBSUB, LLC, a limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>JAMES DAVID WILLIAMS, an individual; *et al.*,<br><br>Defendants.<br><br>AND RELATED CONSOLIDATED ACTION. | Case No. CV 14-4077 PA (AJWx) consolidated with CV 14-7063 PA (AJWx)<br><br>Magistrate Judge Andrew J. Wistrich<br><br>**DECLARATION OF BILL A. BUSBICE, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR DETERMINATION OF APPLICATION OF CRIME-FRAUD EXCEPTION**<br><br>Date: May 11, 2015<br>Time: 10:00 a.m.<br>Place: Courtroom 690<br><br>Discovery Cut-off: July 27, 2015<br>Trial Date: October 6, 2015 |

24871596

DECLARATION OF BILL A. BUSBICE, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR
DETERMINATION OF APPLICATION OF CRIME-FRAUD EXCEPTION

I, Bill A. Busbice, Jr., declare as follows:

1. I am a plaintiff in the above-captioned action, and a managing member of the other two plaintiffs, Ollawood Productions, LLC (f/k/a Olla Productions, LLC) ("Olla") and Ecibsub, LLC ("Ecibsub"). I have personal knowledge as to all matters set forth herein, and if called to testify as a witness, I could and would do so.

### *Made In America* / **Visions, LLC**

2. In April 2013, defendant Gerald Seppala ("Seppala") approached me regarding an opportunity to invest in a feature length documentary, *Made in America*, and introduced me to defendant James David Williams ("Williams"). They proposed an investment through the purchase of membership units in Visions, LLC ("Visions"), a limited liability company organized as the film's project management, development and financing entity. I was told that Seppala and defendant Steven J. Brown ("Brown") were the film's producers, and that Seppala's company, Griffin Productions, which had developed the film, assigned all of its rights regarding the film to Visions.

3. Seppala presented a budget and represented that the minimum financing needed for the documentary was $1,000,000. Following preliminary discussions about an investment, Seppala told me that Williams would invest $500,000 of his own money to purchase membership interests in Visions if I would agree to invest the other $500,000 on an equal basis. Seppala told me that this was a special opportunity because Williams was a prominent Hollywood executive and financier and did not typically invest in projects as small as *Made in America*.

4. On April 15, 2013, Seppala sent me an e-mail attaching a purported wire confirmation (the "Purported 4/15/13 Wire Confirmation") indicating that Williams transferred $500,000 to a JP Morgan Chase Bank ("Chase") bank account opened for Visions, Account No. 478137206 (the "Visions 7206 Account"), which was represented to be the production account for the *Made in America* project. A

1 true and correct copy of the e-mail and the Purported 4/15/13 Wire Confirmation is
2 attached hereto as Exhibit A.
3     5. In connection with this proposed investment, I was represented by an
4 attorney, Richard Huffman.
5     6. On or about April 25, 2013, as part of the "closing" of this investment,
6 Seppala and Williams provided my attorney and me with, among other things: (1)
7 a purported printout of a Chase online statement for the Visions 7206 Account
8 reflecting that, as of April 24, 2013, that account's present balance was $531,610.12
9 (the "Purported 4/24/13 Screenshot"); and (2) a copy of a Subscription Agreement,
10 signed by Williams, representing that Williams was acquiring five Class B Units in
11 Visions for $500,000, which contained an acknowledgement, signed by Seppala,
12 certifying that Visions had already received Williams' $500,000 "by way of wire
13 transfer into the checking or deposit account of Visions, LLC[.]" (True and correct
14 copies of the Purported 4/24/13 Screenshot and Subscription Agreement are
15 attached hereto as Exhibits B and C, respectively.)
16     7. On April 26, 2013, in direct reliance upon on these representations, I
17 caused Ecibsub to wire transfer $500,000 to the Visions 7206 Account.
18     8. It was only much later, in May 2014, that I discovered that defendants'
19 representations, and the Purported 4/15/13 Wire Confirmation and Purported
20 4/24/13 Screenshot, were completely false in that, among many other things,
21 neither Williams, nor any other person or entity, had ever deposited or transferred
22 any money into the Visions 7206 Account, and that the Visions 7206 Account had a
23 zero balance when I transferred my $500,000 into that account. I also later
24 discovered that on the same day that I wire transferred my $500,000 into that
25 account, $450,000 was transferred to another Chase account held in the name of
26 defendant Legacy Film Crest, LLC ("Legacy"), an entity owned and controlled by
27 defendant Williams. Three days later, another $35,000 of my $500,000 investment
28 was transferred out of the Visions 7206 Account to the same Legacy account. I

24871596
- 2 -
DECLARATION OF BILL A. BUSBICE, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR
DETERMINATION OF APPLICATION OF CRIME-FRAUD EXCEPTION

understand that the Legacy account had a negative balance at the time that the first of these transfers were made, and that thereafter, defendant Williams and his co-conspirators treated the account as a personal piggy bank, spending my money on various personal, non-business and unauthorized items.  (I understand that copies of genuine bank statements for the Visions 7206 Account and the Legacy Chase account reflecting these facts, which were produced by Chase pursuant to subpoena in this action, are attached to the concurrently filed Declaration of Thomas H. Prouty.)

9.  At no time did I agree that any part of my $500,000 investment could be used for any purpose other than for co-funding the production budget for the *Made in America* documentary.  To this day I have no knowledge of any documentary having been produced, nor have I received any accounting of the funds that I invested.

### *The Letters*, Part I / Luxe One, Inc.

10.  In June 2013, Williams approached me regarding an investment opportunity that involved the making of a prints & advertising ("P&A") loan in connection with the theatrical release of *The Letters*, a feature film about the life of Mother Teresa.  Williams represented that he had an agreement in place with the owner/producer of *The Letters*, Big Screen Entertainment Partners V ("Big Screen"), to make a $10,000,000 P&A loan for the film, which was to be repaid with interest from the film's net revenues, and which was to be secured in a first position by such revenues.  In addition, according to Williams, that agreement also provided him (through his company, Luxe One, Inc.) with certain lucrative "back end" participation rights in the film's net profits.

11.  Williams also represented to me that he had already advanced $2,000,000 of his own money to Luxe One (through his entity New Legacy Film Investment ("NLFI")), and had obtained a $6,000,000 payment to Luxe One from Chart Investment Fund CV12 ("Chart"), which Williams represented was an entity

1  controlled by certain unnamed clients of his, with which he had done many
2  successful P&A deals in the past. Thus, according to Williams, only $2,000,000
3  remained in order to complete the $10,000,000 P&A loan investment. Williams
4  sought this $2,000,000 from me.

5      12.   I retained attorney Huffman to represent me in connection with this
6  proposed investment as well, and in late June 2013, I organized Olla (with me as its
7  sole member and manager) as the vehicle for the proposed investment in Luxe One.

8      13.   In early July 2013, Williams provided my attorney and me with an
9  agreement dated July 3, 2013, between Olla and Luxe One, entitled "Prints and
10  Advertising Investment Fund Lending Term for the Feature Film 'The Letters'"
11  (the "Letters Term Sheet"), which was signed by Williams on Luxe One's behalf,
12  and contained provisions governing Olla's $2,000,000 contribution, as well as
13  certain of Luxe One's representations regarding the overall P&A investment. (A
14  true and correct copy of the Letters Term Sheet is attached hereto as Exhibit D.)

15      14.   By email dated July 3, 2013, defendant Williams sent me a purported
16  screen shot of the account of Luxe One, Inc. at Chase showing a balance as of July
17  2, 2013 of $8,003,150.24. A copy of this email and the accompanying screen shot
18  (the "Purported July 2, 2013 Luxe One Screenshot") is annexed hereto as Exhibit E.

19      15.   In direct reliance upon Williams' representations regarding the
20  investment, including but not limited to the representation that $8,000,000 had
21  already been funded into Luxe One and the Purported July 2, 2013 Luxe One
22  Screenshot, on July 3, 2013, I wire transferred $2,000,000 to the Chase bank
23  account held by Luxe One, as instructed by Williams.

24      16.   It was only much later, in May 2014, that I discovered that defendants'
25  representations were false in that, among many other things, neither Williams, nor
26  any other person or entity, had ever deposited or transferred any money into the
27  Luxe One account, and that the account had a zero balance when I transferred my
28  initial $2,000,000 into that account. (I understand that copies of genuine bank

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1  statements reflecting these facts, which were produced by Chase pursuant to
2  subpoena in this action, are attached to the concurrently filed Declaration of
3  Thomas H. Prouty.)
4      17.    At no time did I agree that any part of my $2,000,000 investment into
5  Luxe One could be used for any purpose other than as part of a $10 million dollar
6  P&A loan for the marketing and distribution of *The Letters*.

### *Left Behind*

9      18.    On August 8, 2013, Williams e-mailed me regarding an opportunity to
10  invest $2,400,000 in the film *Left Behind*, for interest and ownership of "10% of the
11  Worldwide Revenue from the film[.]"  According to Williams, *Left Behind* was
12  currently in full film production and was "based on the LEFT BEHIND books
13  which have sold 68 million copies . . . second only to HARRY POTTER AND
14  TWILIGHT."  Williams represented that he "put up $18 million from my PandA
15  group for Prints and Advertising[,]" that the film had a $15,000,000 production
16  budget, and that Williams was funding most of that budget himself.  However,
17  Williams represented that he was "in a bind on" the movie, because he was
18  $2,400,000 short, and although Williams could borrow against some of his
19  holdings, that "takes time."  Williams further represented that there were "about six
20  investors that have come in wanting to invest," but that he "just ha[dn't] had the
21  time to fly around an meet with them all."  Williams stated that I was "the first
22  person that [he] thought of" and advised me to "[k]eep in mind that the first three
23  movies in the franchise . . . starring Kirk Cameron . . . made well over $100 million
24  dollars, and this one stars Nicolas Cage."  (A true and correct copy of Williams'
25  August 8th e-mail is attached hereto as Exhibit F.)
26      19.    Based on Williams' solicitation, I expressed interest in *Left Behind* and
27  told Williams that I could invest through my company, Olla.  On or about August
28  11, 2013, Williams sent me an agreement, dated August 12, 2013 and entitled "Left

Behind – Participating Loan Agreement" (the "Left Behind Agreement"), purportedly governing that investment and Olla's participation rights in the film.

20. On August 12, 2013, Williams e-mailed me wire instructions for the *Left Behind* investment and stated: "[o]nly send the $2,400,000 (not the $2,500,000 as outlined in the Agreement). We'll settle that up later. Thanks."

21. Later that day, August 12, 2013, I (through Olla) wire transferred $2,400,000 to a Chase bank account of Left Behind Investments, LLC ("LBI") as Williams instructed, expecting that the investment would be recorded directly in Olla's name, as investor.

22. It was only much later, in May 2014, that I first discovered that the film's producers had no record of any investment in my or Olla's name, and that Williams had arranged for my wire transfer to be recorded as an investment by some entity called "The FBTR Family Trust." I also discovered that Williams' representations regarding his own investments in *Left Behind* were false and that he had never invested any of his own money in *Left Behind* but instead transferred money that I invested in other entities for other pictures (i.e., *The Letters* and *Angels Sing*, discussed below), and had those transfers registered as investments for his own account or benefit. Attached hereto as Exhibit G is a true and correct copy of a letter, dated July 3, 2014, written by LBI's attorney to Williams, which was subsequently provided to my attorneys after this suit was filed.

### *Angels Sing* / **Moment Factory, LLC**

23. In October 2013, Williams approached me regarding another P&A loan investment opportunity, this time in connection with *Angels Sing*, a Christmas-themed feature film starring Harry Connick Jr., Willie Nelson and others. According to Williams, he had set up Moment Factory, LLC ("Moment Factory") for this investment, and was negotiating a deal with the film's master distributor, DF Indie Studios LLC, to make a $4,000,000 P&A loan for *Angels Sing*. The loan was to be repaid, with interest, from the film's net revenues and secured in a first

position by such revenues. In addition, the deal offered "back end" participation rights in the film's net profits. Williams represented to me that he (through his company, Legacy Film Crest, LLC ("Legacy")) had already put $2,000,000 of his own money into Moment Factory for the deal, and that if I contributed $2,000,000, then we would each be invested 50%-50% as equal members of Moment Factory.

24. In connection with this proposed investment, I was represented by an attorney, Michael D. Friedman of Troutman Sanders LLP, who dealt with Williams/Moment Factory's attorney, defendant Barry J. Reiss ("Reiss").

25. On October 30, 2013, in reliance on purported bank records provided by Reiss to my attorney on October 29, 2013 reflecting that, as of October 28, 2013, Moment Factory's Chase bank account contained $1,903,150.24 representing amounts remaining from Williams' purported $2,000,000 contribution (the "Purported Moment Factory Bank Account Screen Shot "), I (through Olla) wire transferred $2,000,000 to Moment Factory's Chase account. A copy of the Purported Moment Factory Bank Account Screen Shot is annexed hereto as Exhibit H.

26. It was only much later, in May 2014, that I discovered that the purported bank record provided by Reiss to Mr. Friedman on October 29, 2013 was false in that, among many other things, neither defendant Williams, nor any other person or entity, had ever deposited any money in the Moment Factory Chase account when I transferred my $2,000,000 into that account, and no other funds were funded after I made my investment. (I understand that copies of genuine bank statements reflecting these facts, which were produced by Chase pursuant to subpoena in this action, are attached to the concurrently filed Declaration of Thomas H. Prouty.)

27. At no time did I agree that any part of my $2,000,000 investment into Moment Factory could be used for any purpose other than as part of a $4 million dollar P&A loan for the marketing and distribution of *Angels Sing*.

## *The Letters*, Part II / Luxe One, Inc.

28. In November 2013, Williams informed me that Luxe One's deal regarding *The Letters* had improved to our advantage. Specifically, Williams represented that because *The Letters* was viewed as such a strong film, Luxe One was given the opportunity to loan up to $22,000,000 for the film's P&A spend. Williams claimed to have negotiated the new and enhanced deal with Big Screen, and he informed me that Luxe One needed to raise an additional $12,000,000 to carry out the deal. Williams represented that both Chart and NLFI (Williams' own company) were each contributing an additional $4,000,000, but that an additional $4,000,000 was needed from me.

29. In connection with this proposed expansion of my investment in Luxe One for *The Letters*, I again was represented by attorney Friedman, who dealt with Williams/Luxe One's attorney, defendant Reiss.

30. Throughout December 2013, Williams repeatedly pressed me for an additional $4,000,000, representing that the total $22,000,000 had to be fully funded by the end of the year, because the film was scheduled to be released in early April 2014, and the producer and distributors demanded confirmation that the full $22,000,000 was in the bank.

31. In early and mid-December 2013, my attorney requested that Reiss and Williams provide, among other things, documentary confirmation that Chart and NLFI had already paid their respective additional $4,000,000 contributions, and that the aggregate sum of $18,000,000 had been funded by that point in time.

32. On December 16, 2013, Reiss sent my attorney, Mr. Friedman, an e-mail confirming that Chart "has funded" its additional $4,000,000, bringing its total contribution to $10,000,000, and that NLFI (Williams' entity) had "completed" its additional $4,000,000 contribution, bringing its total investment to $6,000,000. (I

understand that a copy of this e-mail is attached to the concurrently-filed Declaration of Michael Friedman.)

33. On December 18, 2013, Williams sent my attorney an e-mail attaching what was represented to be a Chase online statement reflecting that, as of December 17, 2013, Luxe One's Chase bank account's balance was $18,014,609.46. Defendant Reiss was copied on the e-mail. A copy of this e-mail with the accompanying Chase screen shot for the Luxe One account as of December 17, 2013 is attached hereto as Exhibit I.

34. In reliance on Williams' and Reiss's representations, including that $18,000,000 had been funded into Luxe One's Chase bank account by Williams and Chart, I caused Olla to wire transferred $4,000,000 to Luxe One's Chase account, as instructed by Williams.

35. It was only much later, in May 2014, that I discovered that defendants' representations were false in that, among many other things: (1) there was actually less than $150,000 (not $18,000,000) in the Luxe One Chase account in mid-December; (2) neither Williams nor Chart had deposited any funds into Luxe One; and (3) Williams and his co-conspirators used the money that they induced me to invest in Luxe One for various personal and unauthorized matters. (I understand that copies of genuine bank statements reflecting these facts, which were produced by Chase pursuant to subpoena in this action, are attached to the concurrently filed Declaration of Thomas H. Prouty.)

36. At no time did I agree that any part of my $4,000,000 investment into Luxe One could be used other than as part of the expanded P&A loan transaction for *The Letters*.

**Williams' Response to Requests for Records and Information**

37. Throughout January and February and the first half of March 2014, my advisors and I repeatedly asked Williams to provide various documents and other information to verify the *bona fides* of the Luxe One and Moment Factory

1 investments including, but not limited to, financial and accounting records for both
2 investments, and information about Chart and its control persons. These requests
3 largely went ignored, and Williams stalled and made excuses.

4     38. On or about March 19, 2014, I received a letter addressed to my
5 accountant, Joan Martin (I was copied on the correspondence), from someone
6 identified as "Carol Martin" on Legacy Film Crest, LLC letterhead (the "3/19/14
7 Letter"). The 3/19/14 Letter purported to enclose "the financial information
8 requested regarding Bill Busbice's and/or Olla Production, LLC's investment in
9 Luxe One, Inc." The 3/19/14 Letter actually enclosed purported Quick Book
10 Reports and Chase Bank statements for July through December 2013 (the
11 "Purported Luxe One July-Dec. Financial Records"). (A true and correct copy of
12 the 3/19/14 Letter and the enclosed Purported Luxe One July-Dec. Financial
13 Records is attached hereto as Exhibit J.)

14     39. The 3/19/14 Letter represented that "the same information regarding
15 Moment Factory" would be sent later in the week. However, no accounting
16 information regarding Moment Factory was ever provided.

17     40. On or about March 28, 2014, I was provided with what were
18 represented as Luxe One's Chase account statements for January and February
19 2014 (the "Purported Luxe One Jan-Feb Statements"). (A true and correct copy of
20 the Purported Luxe One Jan-Feb. Statements is attached hereto as Exhibit K.)

21     41. On other occasions during this time period, Williams and Brown met
22 with me in person and showed me fabricated bank statements and financial
23 information and told me that due to "confidentiality concerns" they could not be
24 provided or shown to my accountant.

25     42. In May 2014, I discovered that the Purported Luxe One July-Dec.
26 Financial Records and Purported Luxe One Jan-Feb Statements were fraudulently
27 created and materially false. (I understand that copies of genuine bank statements

produced by Chase in this action showing this fact are attached to the concurrently filed Declaration of Thomas H. Prouty.)

**Defendants Fraudulently Induced My Investments and Were Not Authorized to Convert My Investments for Their Own Personal Use**

43. Defendants' false representations and deceptive conduct described above induced me to part with the total $10,900,000 for the above-referenced purported investments. I would not have invested in any of these transactions had I known the truth. Furthermore, I never authorized any of the defendants to use my investment funds for their own personal use, for any non-business use, or for any purposes unrelated to the P&A and/or production loans I believed and was told that my investments were for. Until my counsel obtained the genuine Chase bank statements, I was unaware that my funds were being misappropriated and diverted by defendants for unauthorized and improper purposes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April    , 2015 at Dallas, Texas.

_____
Bill A. Busbice, Jr.

- 11 -
DECLARATION OF BILL A. BUSBICE, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR