# VISIONS, LLC
## MEMBER CONTROL AGREEMENT

This Member Control Agreement for Visions, LLC (the "Company"), dated effective as of April 15, 2013, is entered into by and among the Company, a Minnesota limited liability company, and the Members named on the attached <u>Schedule A</u>.

In consideration of the mutual agreements contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Members named on the attached <u>Schedule A</u> agree as follows:

## ARTICLE 1.
## DEFINITIONS

1.1 **Defined Terms.**  The terms defined in this Article shall have the meanings given to them in this Article for purposes of this Agreement.  Certain other capitalized terms in this Agreement may be defined elsewhere in this Agreement.  All defined terms in this Agreement include the singular and the plural as the context indicates.

1.2 **Adjusted Capital Account Deficit.**  "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year determined after (i) crediting to such Capital Account any amounts which such Member is obligated to restore thereto hereunder or is deemed to be obligated to restore thereto pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations and (ii) debiting to such Capital Account the reasonably expected adjustments, allocations and distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.  The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

1.3 **Affiliate** means with reference to the Company, any other Person which directly or indirectly controls, is controlled by or is under common control with the Company or such other Person, and any member, or manager, or Person serving in an equivalent capacity, with the Company or such other Person.

1.4 **Agreement** means this Member Control Agreement as amended and/or restated from time to time.

1.5 **Allocation Regulations** means Treas. Reg. 1.704-1(b) *et seq.* as such regulations may be amended and in effect from time to time and any corresponding provisions of succeeding regulations.

1.6 **Articles of Organization** or **Articles** means the Articles of Organization for the Company filed with the Minnesota Secretary of State on March 5, 2013, as amended or restated.

1.7 **Capital Accounts** means the capital accounts maintained by the Company for each Member as provided in this Agreement.

1.8 **Class A Governance Rights** means the voting and other rights, excepting Financial Rights, of the Class A Members as set forth in this Agreement.

1.9 **Class A Invested Capital** is the amount contributed to the capital of the Company by a Class A Member as set forth on Schedule A to this Agreement. Schedule A shall be updated from time to time upon any additional capital contributions from existing, or initial capital contributions from newly admitted, Class A Members.

1.10 **Class A Member** means a Person admitted as a Member of the Company owning Class A Units pursuant to this Agreement, having the rights established for Class A Units described in Section 5.1.1 of this Agreement. "Class A Member" also means a Person admitted from and after the date of this Agreement as a Class A Member owning Class A Units.

1.11 **Class A Units.** See "Units" and Section 5.1.1 of this Agreement

1.12 **Class B Invested Capital** is the amount contributed to the capital of the Company by a Class B Member, and by all Class B Members, as the case may be.

1.13 **Class B Member** means a Person admitted as a Class B Member of the Company owning Class B Units having the rights established for Class B Units described in Section 5.1.2 of this Agreement.

1.14 **Class B Units.** See "Units" and Section 5.1.2 of this Agreement

1.15 **Class Percentage Interest.** "Class Percentage Interest" for each Member relative to the Class of Units held by such Member, means a fraction, the numerator of which is the total number of each Class (A or B) of Units held by a Member and the denominator of which is the total number of that particular Class of Units issued and outstanding.

1.16 **Code** means the Internal Revenue Code of 1986, as amended, and any successor to such Code. All references to a section of the Code shall mean and include any subsequent amendment or replacement of such section.

1.17 **Company** means Visions, LLC, a Minnesota limited liability company.

1.18 **Event of Company Termination** means an event described in Article 14.

1.19 **Event of Member Termination** means an event described in Article 13.

1.20 **Financial Rights** means a Person's rights to share in Income, Loss and distributions as provided in this Agreement and any right to assign such Rights.

1.21 **Governance Rights** mean all other rights of a Person as a Member in the Company, whether Class A Governance Rights or Limited Governance Rights, except for Financial Rights, as provided in this Agreement and any rights to assign such Governance Rights.

1.22 **Income** means any and all income, gain and credit of the Company.

1.23 **Internal Revenue Service.** "Internal Revenue Service ("IRS")" means the United States Internal Revenue Service.

1.24 **Investor Recoupment.** Refers to that date upon which both of the following events have occurred: a.) Class B Members have received distributions totaling one hundred twenty percent (120%) of their Class B Invested Capital and b.) Class A Members have received distributions totaling one hundred twenty percent (120%) of their Class A Invested Capital

1.25 **Limited Governance Rights** refers to the voting and other rights, excepting Financial Rights or Limited Financial Rights of the Class B Members as set forth in this Agreement.

1.26 **LLC Act** means the Minnesota Limited Liability Company Act set forth in Minnesota Statutes, Chapter 322B, as amended from time to time.

1.27 **Loss** means loss, deduction or debit of the Company.

1.28 **Management Team**. The Management Team is comprised of Jerry Seppala, who serves as Chief Manager/Chief Executive Officer.

1.29 **Manager** or **Officer** means a natural Person elected, appointed, or otherwise designated by the Class A Members as a Manager or Officer pursuant to this Agreement and the LLC Act, including the Chief Manager. A Manager or Officer need not be a Member of the Company.

1.30 **Member** means a Person reflected in the records of the Company as an owner of Member Interests (Units). A Person is not a Member if the Person's Member Interest consists only of Financial Rights.

1.31 **Member Interest** means the interest in the Company consisting of each Person's Financial Rights and Full or Limited Governance Rights, and any right such Person has to assign such Person's Financial Rights and/or Governance Rights. The Company has Class A and Class B Member Interests. Class A and Class B Interests have the Financial Rights and Governance Rights as defined in this Agreement. Member Interests are referred to in this Agreement as Units.

1.32 **Motion Picture** means the dramatic, feature-length Motion Picture currently titled "Made in America" to be made, developed, and created by Company as sole owner of all rights therein and title thereto, including all proceeds, profits, intellectual property, copyrights, plots, themes, titles, ideas, characters, characterizations, and any translations or versions thereof now existing or hereafter created, and all other rights and interests pertaining thereto. The motion picture is to be produced by Griffin Productions LLC (Griffin) for and on behalf of the Company

1.33 **Person** means a natural person or a domestic or foreign limited liability company, corporation, partnership, limited partnership, joint venture, association, business trust, estate, trust, enterprise, or other legal or commercial entity.

1.34 **Profit Participations** means awards of interests in the "profits" of the Motion Picture. Awards may be made to Persons who have provided services and goods to the development, production and/or distribution of the Motion Picture. "Profits" are determined by the Management Team and reflect revenues received from the exploitation of all rights in the Motion Picture less all costs of exploiting such rights, as well as developing and producing the Motion Picture. Profit Participation awarded by the Management Team reduce distributions to Class A Members, but shall have no effect upon, nor alter, any distributions to Class B Members.

1.35 **Related Products** means merchandise and other products (e.g., soundtrack, "making of" movie, trailer, coffee table book, educational materials, etc.) which are integral to the Motion Picture or related to the Motion Picture, which Related Products have been or may be produced as reasonably determined by the Management Team. All Related Products, and all income related thereto, shall be the property of the Company

1.36 **Sale** or **Sale of the Company** means (a) any liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary; (b) any merger, consolidation, or reorganization of the Company with or into any other entity or entities which results in the exchange of outstanding Units (or any securities into which such Units may be converted or exchanged) of the Company for securities or other consideration paid or caused to be issued or paid by any such entity or Affiliate thereof (other than a merger of the Company with or into a wholly-owned Subsidiary of the Company, and a merger or consolidation in which the Members own a majority by voting power of outstanding equity interests of the surviving or acquiring entity); (c) any sale, transfer or disposition of all or substantially all of the property, assets or Units of the Company; or (d) any other form of acquisition or business combination where the Company is the target of such acquisition and where a change of control occurs such that the Person acquiring the Company has the power to elect a majority of the Management Team and or Managers/Officers.

1.37 **Treasury Regulations** means the regulations promulgated by the United States Treasury Department under the Code.

1.38 **Units** are used to designate Member Interests as provided in Article 5 of this Agreement. Existing Units, and Units authorized for issuance in the future as may be

permitted by this Agreement, may be divided into Classes as a majority in interest of the holders of Classes A and B Units may determine from time to time in accordance with this Agreement. This Agreement currently provides for two Classes of Units; to wit: Class A and Class B.

## ARTICLE 2.
## ORGANIZATION OF COMPANY

2.1 **Formation of the Company.** The Company is a limited liability company formed on March 5, 2013, pursuant to and governed by the LLC Act, except as otherwise provided in this Agreement. The rights and liabilities of the Persons owning Units and serving as Managers are as provided under the LLC Act, except as otherwise provided in this Agreement.

2.2 **Term of the Company.** The Company shall exist perpetually until it is terminated in accordance with this Agreement and the LLC Act.

2.3 **Registered Agent and Office.** The name of the Registered Agent is Jerry Seppala, and the address of the registered office of the Company in the State of Minnesota is: 1161 Wayzata Boulevard East, #210, Wayzata, Minnesota 55391.

2.4 **Tax Matters.**

2.4.1 **Tax Status.** The Company shall be classified and taxed as a partnership for federal and state income tax purposes except to the extent that the Company is to be disregarded as an entity for federal and state income tax purposes pursuant to applicable provisions of the Code. If the Company is disregarded for income tax purposes, the Company shall not be disregarded as a separate legal entity for any other purpose, including but not limited to, diminishing in any respect the LLC Act providing that a Person owning or holding Member Interests, serving as a Manager, or other agent of the Company is not, merely on account of such status, personally liable for the acts, debts, liabilities, or obligations of the Company.

2.4.2 **Tax Matters Partner.** Any "tax matters partner" of the Company required to be appointed by the Code shall be the Person selected by the Management Team that meets the qualifications of the Code and applicable Treasury Regulations. Until further determined by the Management Team, Jerry Seppala shall serve as the Company's "tax matters partner."

2.4.3 **Tax Elections.** All elections permitted or required to be made for federal or state income tax purposes on behalf of the Company, including but not limited to, the election under Section 754 of the Code, and all revocations of such elections, shall be made by the Management Team.

# ARTICLE 3.
## SCOPE AND EFFECT OF AGREEMENT

3.1 **Member Control Agreement.** The Persons who are parties to this Agreement intend to make specific arrangements relating to (i) operation, ownership, governance, management, and dissolution of the Company; (ii) allocation of Income and Loss; (iii) distributors; and (iv) receipt of additional capital, admission of new Members and all valuation issues associated with the receipt of such additional capital and admission of new Members; (v) transfer or encumbrance, whether voluntary or involuntary, of Units; and (vi) other matters related to the Company. This Agreement shall constitute a member control agreement under Section 322B.37 of the LLC Act. It is expressly intended that, during the term of this Agreement, the provisions of this Agreement, as they now exist or may subsequently be amended or restated, supersede any provisions of the LLC Act, as it now exists or may be subsequently amended or restated, that are inconsistent or conflict with the provisions of this Agreement to the maximum extent permitted by law.

3.2 **Prior Agreements.** This Agreement supersedes all prior agreements to which any or all of the Parties to this Agreement are party to the extent that such prior agreements are inconsistent with this Agreement, and specifically supersedes all prior member control agreements of the Company, if any, and all prior agreements, written or oral among the Members of the Company.

3.3 **Parties Subject to Agreement.** This Agreement shall be binding on and inure to the benefit of the Company; each Person owning a Member Interest; and their respective heirs, legal representatives, successors, and assigns. A Person's express agreement to be bound by this Agreement or any amendment or restatement of this Agreement may be evidenced by such Person, or such Person's legal representative, either (i) signing this Agreement or such amendment or restatement; (ii) signing a counterpart signature page to this Agreement or such amendment or restatement that references this Agreement and/or such amendment or restatement; or (iii) signing any other document, statement or instrument that evidences agreement to be a party to, and/or bound by, this Agreement and/or such amendment or restatement.

3.4 **Member Interests Subject to Agreement.** This Agreement shall apply to all Member Interests/Units of the Company which are now owned or hereafter acquired by or on behalf of any Person, whether by purchase, distribution, split or other recapitalization, gift, devise, or any other means.

3.5 **Amendment of Agreement.** The terms and provisions of this Agreement may be amended, restated or terminated only by the written agreement of the Members owning at least a majority of the Class A Units, except as may be otherwise specifically provided in this Agreement; provided that any amendment or restatement which materially and adversely affects the Limited Governance or Financial Rights of the Class B Units shall also require the affirmative vote of a majority of the Class B Units.

3.6   **Enforcement of Agreement.**  If a Person violates the terms of this Agreement, the Company and/or any Member may take legal action against such Person or pursue an order compelling such Person to act or restraining such Person from taking an action. If a Person violates this Agreement, the Company and/or any Member will be entitled to recover from such Person reasonable attorney's fees and costs incurred in connection with enforcing the terms of this Agreement.  If a court deems any provision of this Agreement to be overly broad, superseded by the LLC Act, or otherwise unenforceable or void, the court may modify and thereafter enforce the particular provision, as modified, and the balance of this Agreement, or sever such provision if it cannot be so modified and enforce all of the other provisions of this Agreement.

3.7   **Arbitration.**  Any dispute arising out of or relating to this Agreement or the breach thereof (including fraud in the inducement), other than a violation of this Agreement for which equitable relief is sought pursuant to Section 3.6, shall be discussed between the Parties in a good-faith effort to arrive at a settlement.  If such dispute cannot be resolved through discussion, such dispute shall be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules.  The AAA Optional Rules for Emergency Measures of Protection shall also apply to the proceedings.  The arbitration shall be conducted in Hennepin County, Minnesota by a single arbitrator agreed to by the parties.  If the parties are unable to agree, the dispute will be settled by three arbitrators, one of whom shall be chosen by the Company, one by the other disputing party, and the third by the two arbitrators previously chosen.  The Company shall promptly select its appointee and notify the other disputing party thereof.  When so notified, the other disputing party shall, within 15 days, likewise select its appointee and give notice thereof.  If the two arbitrators so selected are unable to agree within a period of 15 days on the selection of a third arbitrator, any party may petition the AAA for the appointment of the third arbitrator.

The decisions of the arbitrator, or a majority of the three arbitrators, as the case may be, shall be final and binding on all parties.  Judgment upon the award of arbitration may be entered in any Court having jurisdiction of the controversy.  Unless otherwise determined by the arbitrator(s), the disputing parties shall pay their own costs and expenses of the arbitration, and shall equally share the costs of the arbitrator and the arbitration proceeding.  Each party shall bear its own attorneys' fees unless the arbitrator(s) shall rule otherwise.

## ARTICLE 4.
## BUSINESS AND ASSETS OF THE COMPANY; COMPANY OPPORTUNITY

4.1   **Business; Purpose.**  The Company is organized to engage in the development, production, distribution and exploitation of the Motion Picture, the licensing, manufacturing and distribution of any Related Products, and the conduct of all other activities related thereto or appropriate in connection therewith.

4.2   **Financing of Motion Picture**.   The Company intends that the Motion Picture be financed through: (i) the sale of an initial ten (10) Class B Units, and, with the prior approval of sixty-seven percent (67%) of the Class B Units, the sale of up to an additional five (5) Class B Units, with each Class B Unit being issued for $100,000.00 cash per Unit and (ii) the sale of twenty (20) Class A Units, all as set forth on Schedule A. The Management Team is also authorized to accept financing commitments from Persons who or which elect not to become Members of the Company.   In the event a portion of financing for the Motion Picture is provided by persons who do not become Members allocation of Income and Loss, and distributions, to such third parties shall be made pro rata based on the percentage of the total project budget ($1.0 million) provided by such parties and the percentage provided by B Unit Holders.   If such third party financing is utilized, such financing shall be obtained on the same terms as applicable to B Units, and the individual economic interests of B Unit Holders, based on the percentage of the total project budget each provides, shall not be adversely affected.   Such third-party financing shall apply against the $1.0 million required to finance the Motion Picture and related costs and activities.

4.3   **Assets.**   The assets of the Company include all rights and title in and to the ownership, development, production, distribution and exploitation of the Motion Picture and all intellectual and other property rights and interests associated therewith, arising therefrom or attendant thereto, proceeds, profits, copyrights, plots, themes, titles, ideas, characters, characterizations, and any translations or versions thereof now existing or hereafter created, and all other rights and interests pertaining thereto, as well as the licensing, manufacturing and distribution of any Related Products, and the conduct of all other activities related to the Motion Picture or appropriate in connection therewith, as well as all cash, income, and property, tangible and intangible, including tax credits, conceived, developed, produced, contributed to or received by, the Company.

4.4   **Other Member Activities.**   Any Member, and any entity in which any Member has an interest, may engage in or possess any interest in any other ventures or businesses of any nature or description, independently or with others, without limitation, regardless in the case of Class B Members, of whether such other ventures or businesses compete with the business of the Company or any other Member.   No Class A Member shall engage, or own a material interest, in a business which competes directly with the business of the Company.   No Class B Member shall have any duty to tender any business opportunity to the Company which does not involve the business of the Company as described in Section 4.1.   Neither the Company, nor any Member by virtue of his, her or its relationship to, or participation in, the Company, shall have any right to participate in any way in any such other venture, or the income or profits derived therefrom.

## ARTICLE 5.
## MEMBER INTERESTS, UNITS AND REGISTRATION

5.1   **Class of Member Interests/Units.**  The Company shall have two Classes of Member Interests/Units having the Governance Rights and Financial Rights described in this Agreement.

    5.1.1   **Class A.**  Class A Member Interests are designated in Class A Units for which Class A Members have contributed the capital set forth on <u>Schedule A</u> to this Agreement.  Each Class A Unit represents (a)  Class A Governance Rights consisting of one vote per Class A Unit when a vote of the Class A Units by Class is permitted or required by this Agreement or the LLC Act; (b) Financial Rights consisting of the right to the allocation of Income and Loss, and the right to distributions as provided in this Agreement; and (c) the right to transfer such Class A Governance Rights and Financial Rights as provided in this Agreement.

    5.1.2   **Class B.**  Class B Member Interests are designated in Class B Units for which Class B Members have contributed the capital set forth in Article 4.2 and on <u>Schedule A</u> to this Agreement.   Each Class B Unit shall represent (a) Limited Governance Rights consisting of one vote per Unit when a vote of Class B Units is provided for in this Agreement; (b) Financial Rights consisting of the rights to the allocation of Income and Loss and the right to distributions as provided in this Agreement; and (c) the right to transfer such Limited Governance Rights and Financial Rights as provided in this Agreement.  The Limited Governance Rights of Class B Units may not be transferred separately from the Financial Rights of Class B Units.

    5.1.3   **Transfers and Assignments of Units.**  Transfers of Units are subject to the provisions of Articles 6 and 10.

5.2   **Additional Class or Class of Member Interests/Units**.  Member Interests/Units of the Company of a different class or Class than the existing Member Interests/Units may only be issued by the Company by amendment of this Agreement in accordance with the provisions of Section 3.5 and any other relevant Section of this Agreement.

5.3   **Certification of Units.**  Units will not be certificated unless otherwise determined by the Management Team.

5.4   **Member Interest/Unit Records.**  Ownership of the Units as of the date of this Agreement is, and subsequently shall be, reflected on <u>Schedule A</u>, and in the Member Interest/Unit ownership records of the Company and shall be binding on the Company only to the extent so reflected.  No purchase, transfer or assignment ("Transfer") of Units shall be effective until reflected in the appropriate records of the Company and then only to the extent so reflected and after compliance with the provisions of this Agreement.  Assuming a permitted transfer of Units, the Company may require written evidence of any transfer in a form and in content acceptable to the Company before reflecting any such transfer in the Company's records, as well as compliance with Articles 6 and 10.  Any allocations of Income and Loss, payments or distributions by

the Company and/or votes of Units on a particular matter, in reliance on the Company's records, shall acquit the Company of all liability to any Person who may have an interest in such allocations, distributions, payments or votes.

## ARTICLE 6.
## ISSUANCE OF UNITS; ADMISSION OF MEMBERS

6.1    **Issuance of Units.**

    6.1.1    **General**.  The Chief Manager is authorized to accept contributions for, enter into contribution agreements and contribution allowance agreements regarding, issue rights to subscribe for, exchange securities for, convert securities into, and issue, sell and deliver Units, at such times, and upon such terms and conditions as the Class A Members and the Class B Members shall determine.  Schedule A reflects the Class A Units sold by the Company to Class A Members as of the date of this Agreement.  The Class A Members have not authorized the sale of additional Class A Units as of the date of this Agreement.

    6.1.2    **Third-Party Financing**.  Following approval of the Management Team, the Chief Manager is authorized to enter into agreements with Persons who provide financing for the Motion Picture, but elect not to become Members of the Company.  In the event a portion of financing for the Motion Picture is provided by persons who do not become Members allocation of Income and Loss, and distributions, to such third parties shall be made pro rata based on the percentage of the total project budget ($1million) provided by such parties and the percentage provided by B Unit Holders.  If such third party financing is utilized, such financing shall be obtained on the same terms as applicable to B Units, and the individual economic interests of B Unit Holders, based on the percentage of the total project budget each provides, shall not be adversely affected.  Such third-party financing shall apply against the $1 million required to finance the Motion Picture and related costs and activities.

    6.1.3    **Issuance of Additional Units**.  Subsequently, if both the Class A Members and the Class B Members determine there is a need to issue or sell additional other Units, they may establish the number, price, terms and conditions of the Units to be sold, and authorize the Management Team to cause the Company to sell and issue such Units.  There is no limitation on the number of Units which the Members so voting may authorize the Company to sell and issue; provided that the Members must amend this Agreement pursuant to Section 3.5 to authorize the sale and issuance of such additional Units.

6.2    **Valuation of Contributions.**  The Class A Members and the Class B Members shall determine the value all contributions made to the Company in exchange for Units.  Whenever the Company accepts contributions, the Management Team shall also revalue the Capital Accounts as provided in Article 7 of this Agreement.

6.3    **Admission Following Issuance of Units by Company.**  Except as provided in Section 6.1.2, if the Members authorize the issuance by the Company of Units to a Person who is not then a Member, such Person shall be admitted as a Member as of the effective date that (a) such Person pays or agrees to pay for the Units to be issued to such Person if payment is required; and (b) such Person executes this Agreement or an agreement to be bound by this Agreement acceptable to the Management Team.  Upon completion of such actions, the Company shall reflect on <u>Schedule A</u>, or in any other records of the Company, as of such effective date (i) the name and address of the Member; (ii) the nature, type and valuation of any payment or capital contribution; and (iii) the Class and number of Units purchased.  If the Company issues Units to a Person who is then a Member, such Person shall continue as a Member and be bound by this Agreement, and such Units will be automatically subject to this Agreement.

6.4    **Transfer of Units; Admission of Transferees.**  The following provisions apply to transfers to Members owning Units, and the admission as a Member of a person who is a permitted transferee of Units.

6.4.1    **Admission Following Transfer.**  Subject to the provisions of Section 6.4.2, any transferee of Units shall be admitted as a Member with respect to such Units as of the effective date that such Person executes and delivers to the Company such Person's agreement to be bound by this Agreement and complies with other requirements of the Management Team.  Any transferee of a Unit who is already a Member shall continue as a Member and shall be bound by this Agreement and such Units shall be automatically subject to this Agreement.  Upon completion of the requirements of this Section 6.4.1 and applicable requirements of Section 6.4.2, the Company shall reflect in Schedule A hereto or in any other records of the Company, as of such effective date (a) the name and address of the transferee; (b) the nature and extent of the transfer; (c) the consideration for such transfer, if any; and (d) the Class and number of Units transferred.

6.4.2    **Conditions of Transfer.**  Any transfer of Class B Units shall require; (a) compliance with the provisions of this Section 6.4 and Article 10; (b) that the transferee make certain written representations to, and agreements with, the Company and its managers and Members, and provide the Company with certain written information prior to the Management Team's decision as to whether to consent to such transfer; (c) compliance with all other provisions of this Agreement; and (d) compliance with all other reasonable requirements or conditions determined by the legal counsel for the Company and the Management Team.  The Management Team may require that the transferor or transferee provide the Management Team with an opinion of legal counsel, which opinion and counsel shall be acceptable to the Management Team and the Company's legal counsel, that the proposed transfer would not violate federal and state securities laws and would not jeopardize the tax status of the Company.  A permitted transferee who complies with the preceding requirements for transfer shall promptly be admitted as a Member as of the date on which the Chief Manager/CEO or the Secretary acknowledges in writing that all requirements for admission have been met.

6.5    **Required Records.**  Ownership of Units, and the Class of such Units, shall be reflected in the required records of the Company, and binding on the Company only to

the extent so reflected.  No transfer or assignment of Units, and no designation of Units shall be effective until reflected in the required records of the Company and then only to the extent so reflected.  The Company may request written evidence of any transfer or assignment in a form and content acceptable to the Company and its legal counsel before reflecting any such transfer, assignment, or designation in the required records of the Company.

## ARTICLE 7.
## CAPITAL CONTRIBUTIONS AND ACCOUNTS; LOANS

7.1    **Members.**  The names, places of residence, capital contributions and Member Interests designations of, and Units owned by, the Members are set forth on <u>Schedule A</u> to this Agreement.

7.2    **Capital Contribution of Class A Members.**  The Class A Members, other than Mr. Busbice and Mr. Williams, have contributed, or will contribute, an aggregate of $55,000.00 cash  to the Company for their Class A Units as set forth on <u>Schedule A</u> to this Agreement.

7.3    **Capital Contributions of Class B Members.**   The Class B Members have contributed, or will contribute, an aggregate of $1,000,000,00 to the Company for Class B Units as set forth on <u>Schedule A</u> to this Agreement. With the prior approval of sixty-seven percent (67%) of the Class B Units, the Management Team may sell up to an additional five (5) Class B Units, with each additional Class B Unit to be sold for $100,000.00 cash per Unit. In the event that such additional Class B Units are authorized to be sold then the existing Class B Members, individually and collectively, shall have the option for a period of fifteen (15) days from the dates of said authorization to purchase pro rata the additional authorized Class B Units. If any such additionally authorized Class B Units remain unsold after such fifteen (15) day option period then the remaining unsold units may be sold to third parties.

7.4    **Required Capital Accounts.**

7.4.1    **Establishment and Maintenance of Accounts.**    The Company shall establish and maintain a separate Capital Account for each Person owning Units, in accordance with Section 704(b) of the Code and applicable Treasury Regulations. Each such Capital Account shall be (a) increased by the cash amount or agreed value of all capital contributions made by such Person; (b) increased by all items of Income allocated to such Person in accordance with this Agreement; (c) decreased by the cash amount or agreed value of all actual and deemed distributions of cash or property made to such Person and (d) decreased by all items of Loss allocated to such Person in accordance with this Agreement.  For purposes of computing the amount of any item of Income or Loss to be reflected in the Capital Accounts of the Persons owning Units, the determination, recognition and classification of any such item shall be the same as its determination, recognition and classification for federal income tax purposes (including any method of

depreciation, cost recovery or amortization used for this purpose), subject to such adjustments or other methodologies as may be permitted or required by the applicable Treasury Regulations as interpreted and applied as determined by the Management Team.

       7.4.2  **Maintenance of Accounts.**  The Capital Accounts shall be maintained in accordance with Section 704(b) of the Code and applicable Treasury Regulations.  The Management Team may, notwithstanding any other provisions in this Agreement, alter the method by which Capital Accounts are maintained in order to comply with Section 704(b) of the Code and applicable Treasury Regulations.

       7.4.3  **Adjustment to Capital Accounts.**  The Management Team shall restate the value of the Capital Accounts upon (a) any contribution made to the Company; (b) any distribution from the Company that was not made to Members as required by Sections 9.1 and 9.2; and (c) the determination by the Management Team that a revaluation is appropriate to maintain Capital Accounts in accordance with Section 704(b) of the Code and applicable Treasury Regulations.  The Management Team may use any method it determines appropriate to revalue the Capital Accounts.

7.5  **Additional Capital Contributions.**  Except as provided in the Act or in this Agreement, no Member shall be obligated to make any additional capital contributions.

7.6  **Additional Accounts.**  The Company may maintain additional accounts for each Person owning a Member Interest having Financial Rights to reflect the equity shown on the Company's financial statements, to record such Person's basis for income tax purposes, or for any other purpose.

7.7  **Interest.**  Except as herein expressly provided, no interest shall be paid by the Company on capital contributions or on positive balances in Capital Accounts.

7.8  **No Withdrawal.**  No Member shall be entitled to withdraw any part of his, her or its capital contribution or its Capital Account or to receive any distribution from the Company, except as provided in this Agreement.

7.9  **Restoration of Deficit Balances.**  No member shall be required to restore any deficit balance in such Member's Capital Account.

7.10  **Loans to the Company.**  Loans to the Company from Members or other Persons shall not be considered capital contributions, but shall be treated for all purposes as loans from unrelated third parties.

## ARTICLE 8.
## ALLOCATIONS

8.1  **General Allocations.**  Except as provided in Sections 8.2, 8.3 and 8.7, all Income and Loss of the Company for each fiscal year shall be allocated among the Members, and to such Members' Capital Accounts, as follows:

### 8.1.1 **Income.**

    (i)    Income, if any, shall be allocated as follows: a.) one hundred percent (100%) to Members holding Class B Units pro rata in accordance with their respective Class Percentage Interests until Members holding Class B Units have received aggregate allocations equal to 120% of their Class B Invested Capital and then b.) one hundred percent (100%) to Members holding Class A Units pro rata in accordance with their respective Class Percentage Interests until Members holding Class A Units have received aggregate allocations equal to 120% of their Class A Invested Capital; provided that such income to Class A Units shall be reduced by the amount of Profit Participations, if any, payable to Profit Participants.

    (ii)    Thereafter, Remaining Income shall be allocated fifty percent (50%) to Members holding Class B Units and fifty percent (50%) to Members holding Class A Units; provided that such income to Class A Units shall be reduced by the amount of Profit Participations payable to Profit Participants. The Income allocated to Members holding Class A and B Units shall be allocated to each Member holding such Units in the proportion that the total number of such Person's Class A or B Units bears to his, her it its Class Percentage Interests.

### 8.1.2 **Loss.**

    (i)    Loss, if any, shall be allocated to Members pro rata in accordance with the relative Capital Account balances of each Member until each Member has a zero Capital Account balance or until the Company has Income, whichever is earlier; and

    (ii)    Thereafter, Loss shall be allocated to Members in accordance with their respective percentage ownership interests in Company.

## 8.2 **Allocations in the Event of Sale of the Company.** Subject to Section 8.7, in the event of a Sale, Income or Loss as a result of such Sale shall be allocated as follows:

### 8.2.1 **Income.** All Income, if any, upon a Sale of the Company shall be allocated as follows:

    (i)    **Loss Recovery.** Income shall be allocated to Members to the extent and in the priority that items of Loss have been allocated to Members pursuant to Section 8.1.2 and items of Income have not previously been allocated to offset such items of Loss pursuant to this Section;

    (ii)    **Return of Invested Capital.** Income shall then be allocated to each Member as provided in Section 8.1.1(i); and

    (iii)    **Remaining Income.** Remaining Income shall then be allocated in accordance with the provisions of Section 8.1.1(ii).

8.2.2   **Loss.**  All Loss, if any, resulting from such Sale shall be allocated in accordance with Section 8.1.2(i).   Once each Member has a zero Capital Account balance, Loss shall be allocated among Members holding Class B Units according to each Class B Unit holder's Class Percentage Interest.

8.3   **Required Allocations.**   Subject to Section 8.7, prior to making any allocations provided in Section 8.1, the following special allocations shall be made in accordance with, and as necessary to give effect to, the applicable Treasury Regulations:

8.3.1   **Minimum Gain Chargeback.**  If there is a net decrease in the minimum gain of the Company or in the member minimum gain attributable to nonrecourse debt during any fiscal year or other accounting period, then items of income or gain of the Company for such fiscal year or other accounting period (and, if necessary, subsequent fiscal years or accounting periods) shall be allocated to each Member or to each Member who has a share of such member minimum gain (determined as set forth in Section 1.704-2(i) of the Treasury Regulations), as the case may be, in an amount equal to such Member's share of the net decrease in the minimum gain (determined in accordance with Sections 1.704-2(d)(1) and 1.704-2(g) of the Treasury Regulation) or in an amount equal to such Member's share of the net decrease in the member minimum gain (determined in accordance with Sections 1.704-2(i)(3) and 1.704-2(i)(5) of the Treasury Regulations), as the case may be.

8.3.2   **Qualified Income Offset.**   If any Member unexpectedly receives any adjustment, allocation or distribution described in Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations that causes it to have an, or increases the amount of its, Adjusted Capital Account Deficit, items of Company income and gain shall be allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, such Member's Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this Section 8.3.2 shall be made to a Member only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 8 have been tentatively made as if this Section 8.3.2 were not in this Agreement.  This Section 8.3.2 is intended to constitute a "qualified income offset" as defined in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

8.3.3   **Nonrecourse Deductions.**  Nonrecourse deductions for any fiscal year or other accounting period (not including, any member nonrecourse deductions) shall be allocated among the Members in proportion to their Percentage Interest.

8.3.4   **Member Nonrecourse Deductions.**   Any member nonrecourse deductions for any fiscal year or other accounting period shall be allocated to the Member who bears the economic risk of loss with respect to the nonrecourse liability, as determined and defined under Section 1.704-2(b)(3) of the Treasury Regulations, to which such member nonrecourse deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

8.3.5   **Basis Adjustment.**   To the extent an adjustment to the adjusted tax basis of any asset of the Company pursuant to Section 734(b) or Section 743(b) of the Code is required pursuant to the Treasury Regulations to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset), and such gain or loss shall be allocated to the Members in a manner that is consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to the Treasury Regulations.

8.3.6   **Limitation on and Reallocation of Net Loss.**   A net loss allocation shall not be made to a Member if and to the extent that such allocation would cause such Member to have an, or increase the amount of its, Adjusted Capital Account Deficit at the end of any fiscal year or other accounting period.   A net loss allocation that would be made to a Member but for this Section 8.3.6 shall instead be made to the other Members to the extent of and in proportion to the amounts of such net loss that they could then be allocated without themselves having Adjusted Capital Account Deficits and thereafter to the Members in proportion to their Percentage Interests.

8.4   **Curative Allocations.**   Subject to Section 8.7, the allocations set forth in Section 8.3 (the "Regulatory Allocations") are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Treasury Regulations.   Notwithstanding any other provision of this Article 8, the Regulatory Allocations shall be taken into account in making allocations of other items of Income and Loss among Members so that, to the extent possible, the net amount of such items of Income and Loss allocated to each Member pursuant to this Article 8, when taken together, shall be consistent with the Code and the Treasury Regulations, and on a cumulative basis, the respective net amounts of such allocations of such other items to the Members are equal to the respective net amounts that would have been allocated to the Members had no Regulatory Allocations been made.   The Management Team shall apply this Section 8.4 at such times and in whatever order, and shall divide allocations made pursuant to this Section 8.4 among the Members in such manner, as it determines is likely to minimize any economic distortions that might otherwise be caused by the Regulatory Allocations.

8.5   **Tax Allocations.**

8.5.1   **General Rule.**   Subject to Section 8.7. for federal income tax purposes, except as otherwise provided in this Section 8.5, items of Income and Loss of the Company shall be allocated among Members in accordance with the manner in which Income or Loss was allocated in Sections 8.1, 8.3 and 8.4.

8.5.2   **Code Section 704(c).**   Income or Loss with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated in accordance with Code Section 704(c) and the applicable Treasury Regulations, among the Persons owning Units so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial gross asset value.   In the event the gross asset value of any Company asset is adjusted

- 16 -

pursuant to this Agreement, subsequent allocations of income and loss with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its gross asset value in the same manner as under Code Section 704(c) and the applicable Treasury Regulations.   To the extent the Treasury Regulations promulgated pursuant to Section 704(c) of the Code permit the Company to utilize alternative methods to eliminate the disparities between the agreed value of property and its adjusted basis, the Management Team, on behalf of the Company, may elect any method prescribed by the Allocation Regulations Section 1.704-3(b) for making allocations required by Section 704(c) of the Code and such election shall be binding on all Persons owning Units.

        8.5.3   **Code Section 706.**   Each item of Income or Loss of the Company attributable to a transferred Unit shall, for federal income tax purposes, be determined by the Management Team pursuant to Section 706 of the Code.

        8.5.4   **Code Section 754.**   Any election by the Company under Section 754 of the Code to adjust the basis of the Company assets pursuant to Section 734 of the Code and Section 743 of the Code shall be made in the discretion of the Management Team.  If such election is made, allocation of items of Company Income and Loss shall otherwise be made in a manner consistent with such allocation of basis in accordance with Section 734 of the Code and/or Section 743 of the Code, as the case may be, notwithstanding any other provision of this Agreement.

8.6   **Interests in Company Income.**   The Members agree that, subject to Section 8.7, their interests in Income for purposes of determining their proportionate shares of the Company's excess "nonrecourse liabilities" (as defined in Treasury Regulations Section 1.752-3(a)(3)) shall be their pro rata share based on the respective Class Percentage Interest of each Member.

8.7   **Allocations in the Event of Third-Party Financing**.   The above allocation provisions assume B Unit holders will provide 100% of the financing for the Motion Picture.  In the event a portion of such financing is provided by Persons who do not become Members as provided for in Section 4.2, allocation shall be made to such third parties pro rata based on the percentage of the total project budget ($1.0 million) provided by such third parties and the percentage provided by B Unit holders.  In the event that third-party financing is utilized by the Company such financing shall be on the same terms as applicable to B Units, and the individual economic interests of the B Unit holders, based on the percentage of the total project budget each provides shall not be adversely affected.

# ARTICLE 9.
# DISTRIBUTIONS

9.1   **Interim Distributions.**   Subject to Section 322B.54 of the LLC Act, distributions may be made to the Members from the Company at such times and in such amounts as determined from time to time by the Management Team provided that all the members

of a Class are treated identically.  Subject to Section 9.8, distributions shall be made to Members holding Class A and Class B Units as follows:

9.1.1  **Initial Distributions.** Initial Distributions shall be allocated as follows: a.) one hundred percent (100%) to Members holding Class B Units pro rata in accordance with their respective Class Percentage Interests until Members holding Class B Units have received aggregate allocations equal to 120% of their Class B Invested Capital and then b.) one hundred percent (100%) to Members holding Class A Units pro rata in accordance with their respective Class Percentage Interests until Members holding Class A Units have received aggregate allocations equal to 120% of their Class A Invested Capital; provided that such distributions to Class A Units shall be reduced by the amount of Profit Participations, if any, payable to Profit Participants.

9.1.2  **Subsequent Distributions.** Following Initial Distributions as set forth in 9.1.1 above, subsequent distributions shall be made fifty percent (50%) to Members holding Class B Units, and fifty percent (50%) to Members holding Class A Units, provided that distributions to Members holding Class A Units shall be reduced by Profit Participation Payments, if any, payable to holders of Profit Participations.  The portion of such distributions made to all Members holding Class A and B Units shall be made to each Member holding Units of a Class according to their respective Class Percentage Interests.

9.2  **Distributions upon a Sale of the Company or Termination.**  Subject to Section 9.8, upon a Sale or termination of the Company, and after allocation of Income and Loss pursuant to Section 8.2, distributions shall be made in the following order of priority:

9.2.1  **Creditors.**   To payment of Company liabilities owed to creditors including to Members other than for their interests in capital and Income;

9.2.2  **Reserves.**  To establish reasonable reserves, if any, deemed necessary by the Management Team to provide for the contingent liabilities of the Company; and

9.2.3  **Initial distributions to Unit Holders.**  As set forth in Article 9.1.1 above.

9.2.4  **Subsequent Distributions to unit Holders.**  As set forth in Article 9.1.2 above.

9.3  **Liquidations.**  Notwithstanding anything herein to the contrary, except in the case of a Sale of the Company or its assets and terminating distributions under Section 9.2, the Management Team may authorize non pro rata distributions to one or more Persons owning Units if such distributions reduce the outstanding Governance and Financial Rights of such Units and the number of Units of such Person or Persons.

9.4  **In Kind.**  Distributions from the Company may be in cash or in kind, but no Person shall have any right to demand and receive any distribution from the Company in any form other than cash.  If any assets of the Company are distributed in kind, such assets shall be distributed on the basis of their fair market value as determined by the Management Team.

9.5 **Withholding.**  The Company is authorized to withhold from amounts to be distributed to any Person hereunder any amount required to be withheld by any provision of the Code, Treasury Regulations or other applicable law, and to pay such amounts to the IRS or other appropriate taxing authority in accordance with the Code, Treasury Regulations or other applicable law.   Any amounts paid over to the IRS or other appropriate taxing authority with respect to a Person owning Units pursuant to this Section 9.5 shall be treated for all purposes hereunder as a distribution made to such Person with respect to whom or which such withholding or remittance was made.

9.6 **Distribution Limitations.**   Notwithstanding anything in this Agreement to the contrary, the Company shall not be required to make a distribution to any Person owning Units if such distribution would violate the LLC Act or any other applicable law.

9.7 **Tax Distributions.**  Notwithstanding the foregoing, the Company shall distribute to each Member, to the extent cash is reasonably available without borrowing and taking into account the reasonable working capital needs of the Company, with respect to each fiscal year, either during such fiscal year or prior to April 15 of the following year, an amount of cash determined by multiplying (i) a percentage equal to the highest marginal income tax rate (combined state and federal) that a hypothetical Member may be subject to, as determined by the Management Team in its discretion, multiplied by (ii) the taxable income for federal income tax purposes of the Company allocated to such hypothetical Member for such fiscal year.   In making such distribution, the Company may take into account prior loss allocated to a Member and any deductions available for state income taxes.  The Management Team shall in good faith make such estimates of the tax distributions to Members to assist Members with payments due by reason of federal and state income taxes.  In the event that pursuant to federal or state law or otherwise, the Company makes a payment of taxes on behalf of any Member (e.g., estimated payments, withholding, or otherwise), such payment shall be treated as a distribution made by the Company to such Member.  Any distribution in excess of the amount to which a Member would be entitled according to the number, Class, Class Percentage Interest and distribution priority attendant to such Class shall be treated as an advance and taken into account in subsequent distributions pursuant to Sections 9.1 and 9.2.

9.8 **Distributions in the Event of Third-Party Financing.**   The above distribution provisions assume B Unit holders will provide 100% of the financing for the Motion Picture.  In the event a portion of such financing is provided by Persons who do not become Members as provided for in Section 4.2, distributions shall be made to such third parties pro rata based on the percentage of the total project budget ($1 million) provided by such third parties and the percentage provided by B Unit holders.  In the event that third-party financing is utilized by the Company such financing shall be on the same terms as applicable to B Units, and the individual economic interests of the B Unit holders, based on the percentage of the total project budget each provides shall not be adversely affected.

# ARTICLE 10.
## TRANSFERS AND RESTRICTIONS REGARDING MEMBERSHIP INTERESTS

10.1 **Permitted Transfer or Assignment.** A Person may transfer or assign (referred to as "transfer") all or any portion of such Person's Units, subject to the restrictions set forth in this Agreement. The transferor or assignor (referred to as "transferor") of Units shall continue to be a Member of the Company to the extent such transferor retains Units, but shall cease to be the owner of the Units transferred. The transferee or assignee (referred to as "transferee") of transferred Units may be admitted as a Member as provided in this Article, subject to the provisions of Article 6 of this Agreement.

    10.1.1 **Transfer of Class A Units.** The Class A Members may not transfer their Class A Units other than to an existing Class A Member, or to an immediate family member for estate and/or tax planning purposes, absent the affirmative vote of sixty-seven percent (67%) of Class B Units. In the case of permitted transfers to immediate family members, the Units transferred shall continue to be subject to the provisions of this Agreement regardless of whether the transferee is admitted as a Member.

    10.1.2 **Transfer of Class B Units.** Class B Unit holders may not transfer the Limited Governance Rights of Class B Units separate from the Financial Rights of such Units. In no event may the holders of Class B Units transfer such Units without compliance with the applicable provisions of Article 6.4.2

# ARTICLE 11.
## MEMBER MEETINGS; VOTING

11.1 **Voting.** Each Member shall have one vote for each Class A and Class B Unit that is reflected in the name of such Member on the required records of the Company. Class B Units have Limited Governance Rights as described in this Agreement It is intended that the method of voting by Members owning Units entitled to vote as provided in this Section and throughout this Agreement shall override Section 322B.356, Subd. 2 of the LLC Act. At each meeting of the Members, every Member owning Units entitled to vote on the matters in question shall be entitled to vote in person or by proxy duly appointed by an instrument in writing subscribed by such Member. Upon the demand of any Member owning Units entitled to vote, the vote upon any question before the meeting shall be by ballot. All elections shall be determined and all questions decided by the affirmative vote of the Members owning at least a majority of the Units entitled to vote on a particular matter at any meeting at which there is a quorum of Units entitled to vote on the matters which are the subject of the meeting, except in such cases as shall otherwise be required by the LLC Act or this Agreement. Whenever in this Agreement a reference is made to a vote by Members, or a Class of Members, notwithstanding anything or any inference to the contrary, such vote shall be according to the provisions of this article 11.1 with each member having one (1) vote for each Unit then owned by him.

11.2   **Meetings.**  Meetings of the Members may be called in accordance with the following and as otherwise provided in the LLC Act:

11.2.1   **Regular Meetings.**  Regular meetings of Members are not required to be held on an annual or other basis; provided, that if a regular meeting has not been held during the immediately preceding 12 months, a Member owning 25% or more of the a Class may demand a regular meeting of the Members by written notice delivered to the Chief Manager or Treasurer of the Company.  No meeting of the Members shall be considered a regular meeting unless specifically designated as such in the notice of meeting or unless a majority of the Units held by the Class of Members are present in person or by proxy.

11.2.2   **Special Meetings.**  Special meetings of the Members may be called at any time by the Chief Manager, Treasurer, Chair, or two or more Managers.  In addition, one or more Members owning 10% or more of the Units of a Class may demand a special meeting by giving written notice of demand to the Chief Manager or Treasurer specifying the purposes of the meeting.

11.2.3   **Meetings Called After Demand of Members**.  Within 30 days after the Chief Manager or Treasurer receives a demand for a meeting from any Member or Members entitled to call a regular or special meeting of the Members pursuant to the provisions of Section 11.2.1 or 11.2.2, the Management Team shall cause such meeting to be called and held on notice no later than 2 days after receipt of such demand.  If the Management Team fails to cause such a meeting to be called and held, the Member or Members making the demand may call the meeting by giving notice as provided in Section 11.2.4 of this Agreement at the expense of the Company.

11.2.4   **Notice of Meetings.**  Except as may be waived or required by the LLC Act, a written notice setting out the place, date and hour of any regular or special meeting shall be given to each Member not less than 5 days nor more than 20 days prior to the date of the meeting.  Notice of any special meeting shall state the purpose or purposes of the proposed meeting and the business transacted at all special meetings shall be confined to the purposes stated in the notice unless all Members are present at the meeting and consent to consider other business.

11.2.5   **Waiver of Notice.**  A Member owning Units and entitled to notice may waive notice of any meeting before, at or after the meeting, in writing, orally or by attendance.  Attendance at a meeting by a Member entitled to vote on a particular matter is a waiver of notice at that meeting unless such Member objects at the beginning of the meeting to the transaction of business because the meeting is not lawfully called or convened, or objects before a vote on any item of business because the item may not be lawfully considered at such meeting and does not participate in the consideration of the item at such meeting.

11.2.6   **Place of Meetings.**  Meetings of the Members shall be held at the principal executive office of the Company or at such other place, within or outside of Minnesota, as is designated by the Management Team.

11.3 **Remote Participation in Member Meetings.**  A Member owning Units entitled to vote on a matter at a meeting may participate in a Member meeting by means of conference telephone or, if authorized by the Management Team, by any other means of remote communication, provided that in each meeting during which there is remote participation by one or more Members or other invitees, all persons so participating, and all persons physically present at the meeting may participate with and hear each other during the meeting.  Participation by a Member owning Units entitled to vote in a meeting by remote means constitutes attendance at the meeting, unless the Member objects at the beginning of the meeting to the transaction of business as provided in Section 11.2.5.

11.4 **Quorum.**  Members owning at least a majority of each Class of Units issued and outstanding which are entitled to vote on a particular matter at a meeting, represented either in person or by proxy, or remotely, shall constitute a quorum for the transaction of business at any regular or special meeting of Members.  If a quorum is present when a duly called or held meeting is convened, the Members present may continue to transact business until adjournment or conclusion of the meeting, even though the withdrawal of a number of Members originally present leaves less than the proportion or number otherwise required for a quorum.  In case a quorum is not present at any meeting, those present shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until the requisite number of Units entitled to vote shall be represented.  At such adjourned meeting at which the required voting power of Members owning Units entitled to vote on a particular matter shall be represented, any business may be transacted which might have been transacted at the original meeting.

11.5 **No Cumulative Voting.**  There shall be no cumulative voting by any of the Members of the Company.

11.6 **Written Action.**  Any action required or permitted to be taken at a meeting of the Members may be taken by written action signed by the number of Members owning Units entitled to vote that would be required to take the same action at a meeting of the Members at which all Members owning Units entitled to vote were present.


# ARTICLE 12.
# MANAGERS

12.1 **General Authority.**  Unless otherwise provide for in this Agreement, the business and affairs of the Company shall be managed by the Management Team and Managers subject to the direction of the Class A Members.

12.2 **Offices.**  The Company shall have one or more Persons elected or appointed by the Members to hold the following offices:

    12.2.1 **Chief Manager.**  A natural person who is the Chief Manager who may also be designated as President and/or Chief Executive Officer.

**12.2.2 Treasurer.**   A natural person who is the Treasurer who may also be designated as Chief Financial Officer.

**12.2.3 Other.**   Such other Managers or agents as the Members deem necessary for the operation and management of the Company, including, but not limited to, a President, Secretary, and one or more Vice Presidents.

**12.2.4 Officers.**   Managers may also be known as the officers of the Company.

12.3   **Specific Authority.**   The Managers of the Company shall have the following powers, rights, duties, and responsibilities unless otherwise determined by the Members:

**12.3.1 Chief Manager/Chief Executive Officer.** The Chief Manager shall be the Company's Chief Executive Officer and shall (i) have general active management of the business of the Company; (ii)  preside at all meetings of the Members; (iii) see that all orders and resolutions of the Members are carried into effect; (iv) sign and deliver in the name of the Company any deeds, mortgages, bonds, contracts, or other instruments pertaining to the business of the Company, except in cases in which the authority to sign and deliver is required by law to be exercised by another person or is expressly delegated by this Agreement or the Members to some other Manager or agent of the Company; (v) in the absence of a Secretary, maintain records of and, when necessary, certify all proceedings of the Management Team and Members and perform other duties of the Secretary; and (vii) perform such other duties as may from time to time be assigned to him or her by the Members.

**12.3.2 Treasurer/Chief Financial Officer.**   Unless provided otherwise by a resolution adopted by the Members, the Treasurer shall (i) keep accurate financial records for the Company; (ii) deposit all monies, drafts and checks in the name of and to the credit of the Company in such banks and depositories as the Class A Members or Management Team shall designate from time to time; (iii) endorse for deposit all notes, checks and drafts received by the Company as ordered by the Class A Members or Management Team, making proper vouchers therefor; (iv) disburse Company funds and drafts in the name of the Company; (v) render to the Chief Manager, or the Members whenever requested by any of them, an account of all transactions by the Treasurer and of the financial condition of the Company; and (vi) perform such other duties as may be prescribed by the Members, Management Team or the Chief Manager from time to time.

**12.3.3 President.**   If the Company has a Chief Executive Officer, unless otherwise prescribed by the Members, the Chief Executive Officer shall hold the office of Chief Manager and/or President and, if the Company has a President, the President shall have such powers and shall perform such duties as may be prescribed by the Members and/or Chief Manager.

**12.3.4 Vice President.**   Each Vice President shall have such powers and shall perform such duties as may be prescribed by the Members, Management Team and/or the Chief Manager.

12.3.5 **Secretary.** The Secretary shall, unless otherwise determined by the Members, Management Team or Chief Manager, be secretary of and attend all meetings of the Members, and may record the proceedings of such meetings in the minute book of the Company and, whenever necessary, certify such proceedings. The Secretary shall maintain or see to the maintenance of the required records and information of the Company as provided in Section 322B.373 of the LLC Act. The Secretary shall give proper notice of meetings of Members and shall perform such other duties as may be prescribed by the Members, Management Team and/or Chief Manager from time to time.

12.4 **Term.** Managers shall hold office until the next election of Managers or until their successors are elected or appointed and qualified or until their earlier death, resignation, removal or unavailability to serve.

12.5 **Delegation.** Unless prohibited by the Members or Management Team, a Manager may delegate in writing some or all of the duties and powers of his or her office to other Persons, upon notification to the Members and the Management Team.

12.6 **Removal.** Any Manager, Officer or agent holding office, including the Management Team, or any members thereof, may be removed, with reasonable cause, by the vote of sixty seven percent (67%) of the Class B Members. Any vacancy in an office of the Company may be filled by the vote of sixty seven percent (67%) of the Class B Members.

## ARTICLE 13.
## MEMBER TERMINATION

13.1 **Events of Member Termination.** The continued membership of a Member in the Company is terminated upon the first to occur of any of the following events occurring with respect to a Member (each an "Event of Member Termination"):

13.1.1 **Death.** The Member's death;

13.1.2 **Retirement or Resignation.** The Member's retirement or resignation as a Member of the Company as defined in Section 322B.306 of the LLC Act;

13.1.3 **Redemption.** The redemption of such Member's complete Member Interest in the Company;

13.1.4 **Assignment or Buyout.** An assignment or a buyout of such Member's Units that leaves such Member with no Governance Rights as provided in Sections 322B.313 or 322B.833 of the LLC Act;

13.1.5 **Bankruptcy.** The Member's bankruptcy;

13.1.6 **Dissolution.** The dissolution of such Member that is a domestic or foreign limited liability company, corporation, partnership, limited partnership, joint

venture, operation, business trust, estate, trust, enterprise, or any other legal or commercial entity;

13.1.7 **Merger.**   A merger in which the Company is not the surviving organization; or

13.1.8 **Other Event.**   The occurrence of any other event that terminates the continued membership of the Member in the Company.

13.2 **Effect of Event of Member Termination.**   If an Event of Member Termination occurs with respect to any Member, the following provisions shall apply:

13.2.1 **Effect on the Company.**   The Company shall continue and shall not be dissolved and terminated.

13.2.2 **Effect on Member.**   An Event of Member Termination does not give a Member a right to have such Member's Units purchased except as specifically provided in this Agreement.   The Units of such Member shall continue to have the same Governance Rights and Financial Rights as existed immediately prior to such Event of Member Termination except to the extent that such Event of Member Termination resulted in the redemption or cancellation of such Units as in the event of a merger in which the Company is not the surviving organization.

13.2.3 **Effect on Transferee or Assignee.**   Any transferee or assignee of such Member's Units may be admitted as a Member as provided in Articles 6 and 10 of this Agreement; provided, if such Event of Member Termination occurs with respect to the last or sole Member of the Company, the legal representative of such Member shall be deemed to be admitted as a Member as of the effective date of such Event of Member Termination and shall be deemed to own the Units owned by such Member immediately prior to such Event of Member Termination, and, in such event, the Company shall not be dissolved as provided in Section 322B.80 of the LLC Act.


**ARTICLE 14.**
**TERMINATION OF THE COMPANY; WINDING UP**

14.1 **Company Termination.**   The Company's existence shall be perpetual, subject to termination:

14.1.1 **Vote of B Unit holders.**   By vote of the holders of sixty seven percent (67%) of the outstanding Class B Units; or

14.1.2 **Member Interest Termination of Sole Remaining Member.**   Upon the occurrence of an Event of Member Termination under Section 13.1 which affects the sole remaining Member of the Company, the provisions of Section 13.2 and this Article 14 shall apply.

14.2 **Winding-Up; Liquidation; Distribution.**   Upon the occurrence of an Event of Company Termination, the Company shall be dissolved and wound-up.  In connection with the dissolution and winding-up of the Company, the Management Team or, if it determines to appoint a liquidator or other representative (the "Representative"), such Representative shall proceed with the sale or liquidation of all of the assets of the Company (including the conversion to cash or cash equivalents of its notes or accounts receivable) and distribution of shall apply and distribute the proceeds of such sale or liquidation, unless otherwise required by applicable law, as provided in Section 9.2.

    14.2.1 **Appraisal of Certain Assets.**  If deemed necessary by the Management Team or Representative, one or more independent appraisers may be hired to appraise the Fair Market Value of Company assets not sold or otherwise disposed of (the cost of such appraisal to be an expense of the Company).

    14.2.2 **Good Faith Effort as to Liquidation of Assets.**  The Management Team or the Representative shall in good faith attempt to liquidate sufficient Company assets to satisfy in cash the expenses, debts, liabilities and obligations of the Company in accordance with Section 9.2.

14.3 **Time for Liquidation.**  A reasonable amount of time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Management Team or the Representative to minimize the Losses and/or maximize the gains attendant upon such liquidation.

14.4 **Release.**  As a condition to the making of any terminating distributions to Class A and Class B Unit holders pursuant to Section 9.2, the Management Team may require each Unit holder to execute a full release of any and all claims which such Unit holder may have against the Company and any Member or Manager of the Company.

14.5 **Termination.**  Upon compliance with the foregoing distribution plan, the Company shall cease activities, and the Management Team or the Representative, as the case may be, shall execute, acknowledge and cause to be filed with the Secretary of State of Minnesota articles of dissolution and termination of the Company.  The provisions of this Agreement shall remain in full force and effect during the period of winding up and until the filing of such articles of dissolution and termination of the Company with the Secretary of State of Minnesota.


# ARTICLE 15.
## FINANCIAL STATEMENTS, BOOKS AND BANK ACCOUNTS

15.1 **Books and Records.**  The Managers shall maintain accurate and complete books and records for the Company, including all records, checks, and deposits slips of all deposit accounts and other accounts of the Company, at the Company's principal business office.  All Members, and their accountants or other agents, shall have full access to and the right to inspect, examine and copy, such books, records, and accounts at all

reasonable times upon written notice to the Company at least ten (10) days in advance of the proposed inspection date.

15.2 **Financial Statements; Tax Information.** The Chief Manager shall cause to be delivered to the Members, and Persons providing third-party financing as applicable, reports respecting the amounts of Income and Loss reportable for federal income tax purposes, including (i) forms K-1, within 75 days of the end of each fiscal year, (ii) a statement, if relevant, showing the computations for determining distributions within a reasonable period after the end of each fiscal year, (iii) accurate and complete unaudited financial statements within 90 to 120 days after the end of each fiscal year, and (iv) such other statements and reports as are required by law.

15.3 **Banking.** The Treasurer and Chief Financial Officer shall open and maintain in the name of the Company one or more separate bank accounts into which shall be deposited the monies of the Company and no other monies. The Company funds shall be used only for Company purposes, and all disbursements of such funds shall be made by authorized Managers.

15.4 **Ratification of Financial Statements.** Unless written objection is made by a Member within 90 days after receipt of the Company's annual financial statements for any fiscal year, each such statement shall be deemed to have been ratified and accepted by all Members, except for such matters as may not be reflected in such annual financial statements as a result of fraud or misrepresentation.

15.5 **Accounting Method and Fiscal Year.** The books and records of the Company shall be maintained by using accounting methods consistent with those used for federal income tax purposes, except to the extent the Management Team shall otherwise determine. The fiscal year of the Company shall be December 31.

## ARTICLE 16.
## INDEMNIFICATION

16.1 **Liability for Certain Acts.** The Class A Members, Managers and Officers shall not be personally liable to the Company, or its other Members, Managers, Officers or other Persons, for damages for any breach of contract or breach of duty as a Class A Member, Manager, or Officer, except as to acts or omissions that were taken in bad faith, involved intentional misconduct, a knowing violation of law or a material breach of the Member Control Agreement. Neither the amendment nor the repeal of this Section 16.1 shall eliminate or reduce the effect of this Section 16.1 in respect to any matter occurring, or any cause of action, suit or claim that, but for this Section 16.1, would accrue or arise, prior to such amendment or repeal.

16.2 **Indemnification.** The Company shall indemnify, reimburse and hold harmless each Indemnitee specified below as follows:

**16.2.1** **Proceeding.** In any threatened, pending or completed action, suit or proceeding (a "Proceeding"), whether civil, criminal, administrative or investigative, to which an Indemnitee was or is a party or is threatened to be made a party by reason of the fact that such Indemnitee is or was a Class A Member, Officer, employee or agent of the Company, or a member, director, officer, employee or agent of any affiliate or subsidiary of the Company, involving an alleged cause of action arising directly or indirectly from the activities of such Indemnitee under this Member Agreement or from the management of the affairs of the Company, the Company shall indemnify and hold harmless such Indemnitee for, from and against, and reimburse such Indemnitee for, all expenses, including attorneys' fees, judgments, fines and amounts paid in settlement, actually and reasonably incurred by such Indemnitee in connection with the defense or settlement of such Proceeding, if such Indemnitee acted in good faith and in a manner reasonably believed by such Indemnitee to be in or not opposed to the best interests of the Company; provided that the Indemnitee's conduct shall not have constituted bad faith, intentional misconduct, a knowing violation of law or a material breach of this Member Agreement. The termination of a Proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent shall not of itself create a presumption that an Indemnitee did not act in good faith and in a manner reasonably believed by such Indemnitee to be in or not opposed to the best interests of the Company unless such a finding is specifically made part of such judgment, order, settlement, or conviction. The Company shall also indemnify and hold harmless such Indemnitee for, from and against, and reimburse such Indemnitee for any expenses incurred in connection with a Proceeding brought by or in the right of the Company to procure a judgment in its favor; provided that if in such Proceeding the Indemnitee shall have been adjudged to be liable for bad faith, intentional misconduct, a knowing violation of law or a material breach of this Member Agreement, such indemnification and reimbursement shall be provided only if, and only to the extent that, the court in which such Proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all circumstances of the case, the Indemnitee is fairly and reasonably entitled to such indemnity and reimbursement as such court shall deem proper.

**16.2.2** **Advance of Expenses.** Expenses (including attorneys' fees and expenses) incurred in defending any Proceeding subject to Section 16.2.1) shall be paid by the Company in advance of the final disposition of such Proceeding upon (i) a determination by independent legal counsel, based on the facts then known, that Indemnitee acted in the best interests of the Company and that his or her conduct did not constitute bad faith, intentional misconduct, a knowing violation of law or a material breach of this Member Agreement, and (ii) receipt of an undertaking (which need not be secured) by or on behalf of the Indemnitee to repay such amount if it shall ultimately be determined, by a court of competent jurisdiction or otherwise, that the Indemnitee is not entitled to be indemnified by the Company as authorized hereunder.

**16.2.3** **Payment or Other Performance.** Any payment or other performance for or on behalf of any Indemnitee under Section 16.2.1, unless ordered by a court, shall be made by the Company only as authorized in the specific case and only upon a determination that such payment or performance is proper in the circumstances because such Indemnitee has met the applicable standard of conduct set forth in Section 16.2.1.

Such determination shall be made by the independent legal counsel for the Company. Any such payment or performance shall be made only from the assets of the Company.

16.2.4 **Rights in Addition.** The rights provided by this Section 16.2 shall be in addition to any other rights to which an Indemnitee may be entitled under any other agreement, by consent of all the Members, as a matter of law or otherwise. Such rights shall continue as to an Indemnitee who has ceased to serve in the capacity giving rise to such right of indemnification and shall inure to the benefit of the heirs of such Indemnitee.

16.2.5 **Insurance.** The Company may purchase and maintain insurance on behalf of any one or more Indemnitees and other Persons as the Management Team shall determine against any liability that may be asserted against, or expense that may be incurred by, such Person in connection with the activities of the Company, whether or not the Company would have the power to indemnify or hold harmless such Person from and against or reimburse such Person for such liability hereunder.

16.2.6 **Interest in Transaction.** The rights of an Indemnitee under this Section 17.2 shall not be denied in whole or in part because the Indemnitee had an interest in a transaction with respect to which such rights apply if the transaction was otherwise permitted by the terms of this Member Agreement.

16.2.7 **No Rights for Other Persons.** The provisions of this Section 16.2 are for the benefit of the Indemnitees and their heirs, and shall not be deemed to create any rights for the benefit of any other Persons.

16.3 **Procedures.**

16.3.1 **Notification.** An Indemnitee shall promptly notify the Management Team and the Members upon commencement of a Proceeding for which the Indemnitee intends to seek indemnification against Damages, and/or advancement of expenses. Failure to notify the Management Team and the Members will not relieve the Company from its obligations, if any, to indemnify, and advance expenses of, the Indemnitee with regard to any liabilities incurred and expenses paid prior to such notification unless, and then only to the extent that, the Company has been damaged by such delay in notification.

16.3.2 **Assumption of Defense.** The Company may, alone or jointly with any other indemnifying party, assume the defense of a Proceeding for which it received notice or otherwise, and shall promptly notify the Indemnitee as to whether it will assume such defense. If the Company assumes such defense, the Company will not be liable to the Indemnitee for any expenses subsequently incurred by the Indemnitee in connection with the defense of such Proceeding unless the Indemnitee shall have reasonably concluded that there is a conflict of interest between the Company and the Indemnitee (or between the Indemnitee and one or more other Indemnitees whose defense has been assumed by the Company), in the conduct of the defense of the Proceeding, and such conclusion is supported by an opinion of counsel experienced in the defense of litigation against

- 29 -

corporate directors and officers, which counsel and opinion shall be satisfactory to the Company and its legal counsel.

16.3.3 **Approval of Indemnitee's Counsel.** In the event the Company does not assume the defense of the Proceeding, the Indemnitee may engage legal counsel to conduct such defense. In such event the Company shall have the right to approve the Indemnitee's choice of counsel and the terms of engagement of such counsel, which approval shall not be unreasonably withheld. With respect to its approval, the Company may consider:

(i)     Whether the Indemnitee is cooperating in the selection of counsel with the Company and other Indemnitees so that all Indemnitees are represented by one law firm except to the extent Section 16.3.2 regarding conflicts of interest is applicable and satisfied;

(ii)    The experience of such counsel in similar matters;

(iii)   The financial arrangements with such counsel; and

(iv)    To the extent the Company has obtained insurance applicable to such Proceeding, whether such insurance company has consented to the Indemnitee's choice of counsel and the terms of engagement of such counsel.

16.3.4 **Settlements.**    The Company shall not be liable to indemnify any Indemnitee under this Article 16 for any amounts paid in settlement of any Proceeding effected without the Company's prior written consent. The Company shall not settle any action or claim in any manner which would impose any non-indemnified penalty, limitation, expense or liability on the Indemnitee without the Indemnitee's prior written consent.   Neither the Company nor the Indemnitee will unreasonably withhold their consent to any proposed settlement.

16.3.5 **Right to Counsel.**   With respect to any Proceeding as to which the Company has not assumed the defense, the Company may engage its own counsel, at its expense, to assist in the defense of such Proceeding. With respect to any Proceeding as to which the Company has assumed the defense, an Indemnitee may engage his, her, or its own counsel, at his, her, or its own expense, to assist in the defense of the Proceeding.

16.3.6 **Effect on Statutory Requirements; Definitions.**

16.3.6.1 The limitations set forth in Section 16.3 shall be in addition to the statutory standards for indemnification and advancement of expenses set forth in the LLC Act.

16.3.6.2 "Indemnitee" means any person who is or may be eligible for indemnification or advancement of expenses by the Company pursuant to this Article 17 and includes such Indemnitee's estate, spouse or legal representative.

16.3.6.3 "Proceeding" means any action, claim, suit, inquiry, investigation, court or administrative or arbitration proceeding, or appeal taken from any of the foregoing by or before any court or governmental authority whether pending or threatened.

16.3.6.4 "Damages" means any costs, expenses, fines, judgments, settlements, penalties or other monetary amounts incurred in connection with a Proceeding.

## ARTICLE 17
## RESTRICTION ON CERTAIN ACTIONS

17.1   Notwithstanding anything to the contrary herein, none of the following actions or events shall occur, by vote or otherwise, unless and until such action or event shall have received the affirmative vote of sixty-seven percent (67%) of the Class B Units: to wit:

a. The drawdown of, or borrowing of funds pursuant to, that certain "Single Picture P&A Credit Facility Term sheet dated March 18, 2013;

b. The fixing of any salary or other forms of compensation to the Management Team, Company Managers, or Officers;

c. The borrowing of money , or raising of additional capital, for or on behalf of the Company in excess of Fifty Thousand and 00/100 Dollars ($50,000.000;

d. The issuance of additional Member Interests or Units, whether whole, fractional or otherwise;

e.  The sale of all, or substantially all, of the assets of the Company;

f.  The dissolution or liquidation of the Company;

g.  Excluding any " talent contract" which does not exceed one hundred thousand dollars ($100,000.00) , the letting of any production contracts or similar agreements for the MotionPicture which are in excess of $50,000.00: and

h.  The return to any Class B Member of any investment made by him in the company, or of the funds paid for the purchase of his membership units, which is not proportionate to returns made to other Class B Members.

## ARTICLE 18
## MISCELLANEOUS

18.1   **Notices.**  All notices required or permitted to be given or served under the terms of this Agreement shall be in writing and shall be deemed to have been duly given on the date and at the time delivered in person or by reputable overnight courier, at the time delivery is confirmed electronically if delivered by fax, or three (3) days after being deposited in the United States first class or certified mail, postage prepaid, and addressed (i) to a Member at the Member's principal place of business or at such other address as a Member shall designate to the Company or the other Members in writing; (ii) to the Chief Manager of the Company at the Company's principal executive office; or (iii) to such other party at the address determined after reasonable investigation or as specified in writing by such other party.

18.2 **Scope of Agreement.**  This Agreement shall be binding upon and enforceable by the parties hereto and their respective heirs, legal representatives, successors, and assigns who are obligated to take any action which may be necessary or proper to carry out the purpose and intent hereof.

18.3 **Counterparts.**  This Agreement may be executed in several counterparts and shall be effective when there are attached together execution pages containing the signatures of each of the parties hereto, each of which counterpart shall be deemed to be an original, but all of which shall constitute one and the same instrument.

18.4 **Waiver.**  No waiver, amendment, or modification of any term, condition, or provision of this Agreement shall be valid or in effect unless made in writing, signed by the Parties to be bound, specifying with particularity the nature and extent of such waiver, amendment, or modification.  Any waiver by any Party of any default by another Party hereto shall not affect or impair any right arising from any subsequent default.

18.5 **Governing Law.**  This Agreement is made in and shall be interpreted and enforced in accordance with the laws of the State of Minnesota, and each of the parties hereto irrevocably consents to personal jurisdiction in the District Courts or the Federal Courts in the State of Minnesota.

*Signatures on following pages.*

COMPANY SIGNATURE PAGE
TO
MEMBER CONTROL AGREEMENT
FOR
VISIONS, LLC

IN WITNESS WHEREOF, the Company and Members have executed this Member Control Agreement with all of the schedules referenced herein effective as of April 15, 2013.

VISIONS, LLC

By: _____

Jerry Seppala
Its: Chief Manager

**CLASS A MEMBER SIGNATURE PAGE**
**TO**
**MEMBER CONTROL AGREEMENT**
**FOR**
**VISIONS, LLC**

The undersigned, by executing this Signature Page, hereby executes this Member Control Agreement as a Class A Member and agrees to be a party to, and be bound by, the terms and conditions of this Member Control Agreement for The Visions, LLC, a Minnesota limited liability company, dated effective as of April 15, 2013 as the same may be amended or modified from time to time in accordance with its terms.

*Class A Members:*

_____
Jerry Seppala

_____
David Williams


Ecibsub, LLC

_____
By:
Its:

- 34 -

CLASS A MEMBER SIGNATURE PAGE
TO
MEMBER CONTROL AGREEMENT
FOR
VISIONS, LLC

The undersigned, by executing this Signature Page, hereby executes this Member Control Agreement as a Class A Member and agrees to be a party to, and be bound by, the terms and conditions of this Member Control Agreement for The Visions, LLC, a Minnesota limited liability company, dated effective as of April 15, 2013 as the same may be amended or modified from time to time in accordance with its terms.

*Class A Members:*


_____
Jerry Seppala


_____
David Williams


Ecibsub, LLC

_____
By:

Its: Chief Manager

- 34 -

**CLASS B MEMBER SIGNATURE PAGE**
**TO**
**MEMBER CONTROL AGREEMENT**
**FOR**
**VISIONS, LLC**

The undersigned, by executing this Signature Page, hereby executes this Member Control Agreement as a Class B Member and agrees to be a party to, and be bound by, the terms and conditions of this Member Control Agreement for Visions, LLC, a Minnesota limited liability company, dated effective as of April 15, 2013 as the same may be amended or modified from time to time in accordance with its terms.

*Class B Members:*

_____
David Williams

Ecibsub, LLC

_____
By:
Its:

- 35 -

CLASS B MEMBER SIGNATURE PAGE
TO
MEMBER CONTROL AGREEMENT
FOR
VISIONS, LLC

The undersigned, by executing this Signature Page, hereby executes this Member Control Agreement as a Class B Member and agrees to be a party to, and be bound by, the terms and conditions of this Member Control Agreement for Visions, LLC, a Minnesota limited liability company, dated effective as of April 15, 2013 as the same may be amended or modified from time to time in accordance with its terms.

*Class B Members:*

_____
David Williams

Ecibsub, LLC

By: _____

Its: Chief Manager

SCHEDULE A
TO
MEMBER CONTROL AGREEMENT
OF
VISIONS, LLC

| Name | Address | Number of Class A Units | Capital A Invested Capital | Class Percentage Interest |
|---|---|---|---|---|
| Jerry Seppala | 1161 Wayzata Boulevard East #210 Wayzata, MN 55391 | 18 | $55,000 | 90% |
| David Williams | | 1 | $0 | 5% |
| Ecibsub, LLC | | 1 | $0 | 5% |
| | TOTALS | 20 | $55,000 | 100% |

| Name | Address | Number of Class B Units | Capital B Invested Capital | Class Percentage Interest |
|---|---|---|---|---|
| David Williams | | 5 | $500,000 | 50% |
| Ecibsub, LLC | | 5 | $500,000 | 50% |
| | TOTALS | 10 | $1,000,000 | 100% |

Dated April 25, 2013
VISIONS, LLC

By: _____
    Jerry Seppala
    Its: Chief Manager

- 36 -